UNITED STATES of America,
Appellee,

v.

Joseph RUGGIERO, Defendant-
Appellant.

No. 418, Docket 72-1954.

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1972.

Decided Jan. 23, 1973.

Crawford Martin, Atty. Gen., Austin, Tex., for respondent-appellant.

Weldon Clark Dixon, pro se.

Before BELL, DYER and CLARK, Circuit Judges.

Herald Price Fahringer, Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., of counsel), for appellant.

Harold F. McGuire, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., John P. Cooney, Jr., Richard Ben-Veniste, Richard J. Davis, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before LUMBARD, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

The principal issue upon this appeal by Joseph Ruggiero from a judgment convicting him, after a jury trial, of giving false testimony before a federal grand jury in violation of 18 U.S.C. § 1623,[1] is whether he was denied a fair trial by reason of the failure to turn over to him a transcript of the testimony of certain other witnesses before the grand jury. Ruggiero contends that the refusal of the government to disclose the testimony and of the trial court to direct such disclosure constituted a suppression of exculpatory evidence in violation of his rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree and, finding no merit in the other grounds advanced by appellant, we affirm.

The prosecution of Ruggiero, a politically active attorney, former law chairman of the New York County Republican Party and counsel to the New York State Racing Commission, arises out of testimony given by him on March 4,

---

[1]. 18 U.S.C. § 1623 provides:
  "§ 1623. False declarations before grand jury or court.
  "(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
  "(b) This section is applicable whether the conduct occurred within or without the United States.
  "(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if
  (1) each declaration was material to the point in question, and
  (2) each declaration was made within the period of the statute of limitations for the offense charged under this section.
  In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.
  "(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.
  "(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence."
Ruggiero was originally charged with a five-count indictment under 18 U.S.C. § 1621, the general perjury statute, but subsequently a superseding indictment under 18 U.S.C. § 1623 was returned.

1971, before a federal grand jury with respect to the purpose of a $2500 cash payment received by him in 1967 from Herbert Itkin, later a government informer, in the presence of James Marcus, former New York City Water Commissioner, and Charles Rappaport, an associate of Itkin. The indictment also charges Ruggiero with giving false testimony as to his familiarity with the name of one Jack McCarthy, a "labor consultant" to Carey Transportation, Inc. ("Carey"). The government contended and introduced evidence at trial to show that the $2500 payment was an installment of a larger sum furnished by McCarthy on the understanding that Ruggiero would pay over the $2500 to a member of the New York State Public Service Commission, James Lundy, to obtain the denial of an application by Brown Limousine Service ("Brown"), Carey's competitor, for authority to operate buses for air crews and passengers in and out of Kennedy Airport. The substance of Ruggiero's testimony, later repeated by him at trial, was that he received the $2500 solely as a fee for his own services in exerting his influence and that of Vincent Albano, Chairman of the New York County Republican Party, upon Lundy.

To understand the issues, including the significance of the specific grand jury testimony of Ruggiero which formed the basis of the prosecution, a brief summary of those facts which the jury was entitled to find from the evidence is essential. The drama opens in February or March of 1967 when Marcus and Itkin were approached by Jack McCarthy, Carey's "labor consultant," who inquired whether the Brown application could be blocked. McCarthy indicated that "there'd be $10,000 available if it could be stopped." After a preliminary approach by Itkin to Ruggiero, a meeting was held between McCarthy, Itkin, Marcus and Thomas Sheridan, an attorney for Carey, at which the details of a plan to achieve the objective in return for $10,000 were discussed. Itkin and Marcus then met with Ruggiero,

who agreed to see Lundy about the matter of stopping the Brown application but expressed annoyance at their having fixed the price "before you found out how much it will cost in Albany, what Lundy will charge?" In a further talk with Itkin, Ruggiero insisted that he needed $7500 to carry out the scheme, saying "You can't pay off a commissioner a few hundred dollars. Now either get me the money or forget the deal." After talking with McCarthy, Itkin agreed to pay the $7500 demanded by Ruggiero.

A few days later Itkin and Marcus, this time joined by Rappaport, met again with Ruggiero. Thereupon Itkin passed $2500 in cash in an open envelope to Ruggiero. Itkin, urging Ruggiero to be successful, advised that Jack McCarthy was "on my neck," to which Ruggiero replied that he had dealt with "McCarthys" and would fulfill his part of the deal. However, the scheme failed. In June of 1967 the Public Service Commission granted the Brown application to the extent of awarding it the right to transport passengers by bus from Kennedy Airport, and crews by bus from major New York City airports, to designated nearby hotels.

McCarthy complained about the Public Service Commission's decision and demanded the return of the money. Ruggiero countered that he was entitled to the balance of the $7500. Though a meeting between Ruggiero and McCarthy never materialized, Ruggiero did meet with Sheridan who demanded the return of all monies. The matter ended in a stalemate.

On March 4 and 9, 1971, Ruggiero testified before a federal grand jury. The following questions and answers formed the basis of the three counts of the indictment here under consideration, on which he was found guilty:

"COUNT ONE

"Q. When Mr. Itkin originally told you how much money would be available, did you tell him that was not enough, because money had to be paid

before you could do anything to block Brown? A. No, sir.

"Q. Did you ever suggest anything like that, that it was not enough, because money had to be paid before you could do anything to block Brown,—to Mr. Itkin, Mr. Marcus or Mr. Rappaport? A. Absolutely not.

"Q. Did they ever ask you to pay anybody any money to block the Brown Company? A. No, sir.

"Q. Was there ever any understanding between any of the four that I've mentioned,—yourself, Mr. Itkin, Mr. Rappaport or Mr. Marcus,—for you to receive money to pass on, so that Brown Brothers would be blocked? A. No, sir.

"COUNT TWO

"Q. Did you also promise that Mr. Albano would speak to Comm. Lundy, was that part of your arrangement? A. I think it was understood that I was going to speak to Mr. Albano. In fact I think they asked me to speak to Mr. Albano, because frankly, on my own I didn't know Mr. Lundy that well to just call him up and speak to him.

"Q. To say in Layman's terms, you were being paid the twenty-five hundred dollars to exert your influence, is that correct, and the influence of Mr. Albano? A. I would have to say yes to that, Mr. Ben-Veniste.

"COUNT THREE

"Q. Do you know an individual by the name of Jack McCarthy? A. No, sir.

"Q. Ever heard the name before? A. I only read the name in the papers, if it's the same individual.

"Q. Ever had a conversation with Itkin in which he mentioned the name

of Jack McCarthy to you? A. Not that I recall.

\*    \*    \*    \*    \*

"Q. Did you ever have a conversation with Charles Rappaport in which he mentioned the name Jack McCarthy to you? A. Not that I recall.

\*    \*    \*    \*    \*    \*

"Q. Did Mr. Itkin ever tell you that Mr. McCarthy was involved in that matter? A. No, I don't remember the name McCarthy until all of this was over with."

On June 14, 1972, after a five-day trial before Judge Ryan, the jury returned verdicts of guilty on the three counts and acquitted Ruggiero of charges in a fourth count. On August 17, 1972, Judge Ryan sentenced Ruggiero to concurrent terms of one year and a day on each of the three counts, from which judgment this appeal was taken.

## I. *The Brady Point*

■ Both before and during the course of the trial defense counsel moved for production of exculpatory information in the government's possession, including any exculpatory grand jury testimony. The application was denied except for Ruggiero's own grand jury testimony.[2] Ruggiero contends that since Lundy presumably testified before the grand jury that he had not received any money from Ruggiero, Lundy's grand jury testimony would corroborate Ruggiero's own testimony that he did not receive the $2500 "to pass on," and that Sheridan's grand jury testimony would presumably corroborate other aspects of Ruggiero's story. Therefore, Ruggiero argues that denial of access to the transcripts of the grand jury testimony of Lundy, Sheridan and Vincent Albano,[3] none of whom was called by ei-

2. After noting the government's continuing obligation under *Brady*, Judge Ryan originally granted the discovery motion to the extent of requiring the government to produce the transcripts of the testimony in which Ruggiero's name was mentioned. After reargument and personal examination of the minutes, Judge Ryan modified his order to include only the defendant's own grand jury testimony.

3. On appeal the defendant does not and could not seriously argue that the court's refusal to permit the inspection of the grand jury minutes of Albano, a close associate of Ruggiero, constituted "suppression" within the meaning of *Brady*.

ther side or testified at the trial, infringed his right to due process under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This claim requires a review of the principle established by *Brady*.

In *Brady* the Supreme Court was faced with a prosecutorial suppression of crucial exculpatory evidence. Brady, charged with first degree murder, admitted his participation but asked the jury to return a verdict without capital punishment because his co-defendant Boblit had actually done the killing. The prosecutor, when requested by Brady to examine his co-defendant's several pretrial statements, purported to make them all available but withheld the one that was most important for Brady's defense, a statement by Boblit admitting that he, rather than Brady, committed the homicide. Brady was found guilty of first degree murder and sentenced to death. The Supreme Court condemned the "suppression of this confession [as] a violation of the Due Process Clause of the Fourteenth Amendment." 373 U.S. at 86, 83 S.Ct. at 1196.

In a recent case, Moore v. Illinois, 408 U.S. 786, 794, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the Supreme Court reiterated that "[t]he heart of the holding in *Brady* is the prosecution's *suppression of evidence*, in the face of defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment." (Emphasis supplied). In the context of the *Brady* requirement "any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." Giles v. Maryland, 386 U.S. 66, 96, 87 S.Ct. 793, 808, 17 L.Ed.2d 737 (White, J., concurring).

■ Applying *Brady's* rationale here, it is readily apparent that an essential element is missing. There was no suppression of exculpatory evidence by the government. On the contrary, the government turned over the requested grand jury minutes to the trial judge for *in camera* inspection and ruling.

This conduct can hardly be classified as "suppression."

■ Nor was Judge Ryan's denial of disclosure erroneous. Appellant knew the identity and location of Lundy and Sheridan and of the likelihood that they might give testimony helpful to his defense. Indeed, according to his own testimony Ruggiero had originally participated in conversations with each of them relating to the matters that were later the subject of his grand jury testimony and had every reason to believe, if his own denial of his or their involvement in any attempted bribery is accepted, that they would in all likelihood corroborate his testimony rather than fabricate a bribery scheme that would only serve to incriminate themselves. The likelihood that Lundy would have given such corroboratory proof was apparent from all the surrounding circumstances, including the government's failure to call him as a witness at trial. In summation defense counsel himself emphasized that:

"[T]hey had Mr. Lundy before the grand jury. They heard his testimony. . . . Don't you think for one second that if Mr. Lundy had testified before the grand jury, that if this man said anything improper to him, had offered him any money, had told him to fix this deal, they would have had him in here on this witness stand so fast it would have made their eyes pop?"

■■ The purpose of the *Brady* rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him. Here the appellant was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as Lundy and Sheridan might furnish. He was also well aware of the process by which they could be compelled to testify at trial. As long as they could be subpoenaed to

testify, their grand jury testimony, if offered in their absence, would have been excluded as hearsay. If appellant wanted their testimony, the obvious and logical course was to subpoena them and put them on the witness stand.

■ Before calling Lundy and Sheridan as trial witnesses, defense counsel was not legally barred from interviewing them to ascertain the substance of their prospective testimony. Indeed if he had not attempted to do so, he would have been remiss in the performance of his pretrial duties as trial counsel, see Xydas v. United States, 144 U.S.App.D. C. 184, 445 F.2d 660, 667, 668 (1971). If, after subpoenaing them to testify at trial, he should be surprised by their trial testimony, he would be entitled to examine and use their grand jury transcript for the purpose of refreshing their recollection or even of impeachment. See United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967); Dennis v. United States, 384 U.S. 855, 868–870, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Lerma v. United States, 387 F.2d 187, 190 (8th Cir.), cert. denied, 391 U.S. 907, 88 S.Ct. 1658, 20 L.Ed.2d 421 (1968). Cf. United States v. Freeman, 302 F.2d 347, 351 (2d Cir. 1962), cert. denied, 375 U. S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963); Proposed Rules of Evidence for the United States Courts and Magistrates, Rule 607.

■ Defense counsel now argues for the first time that he attempted unsuccessfully to interview Lundy, Sheridan and Albano before trial. But neither the government nor the trial judge was so advised. Indeed, in seeking pretrial discovery of any witness' statement that might be favorable to the defense, including the grand jury testimony of Lundy, defense counsel advised the court that the statements could be furnished without endangering these witnesses because ". . . it is expected that they would be friendly to us." Although Ruggiero's counsel, in later seeking the grand jury transcripts, argued that "[W]e shouldn't be in the position of having to subpoena people blind, bring them in here and estimate and guess as to what they will say on the stand," that statement is consistent with the thought that he simply wanted to protect against possible inconsistencies between off-the-record interviews of the witnesses and their grand jury testimony. To mandate disclosure upon such an insubstantial ground would not only violate the policy of secrecy surrounding grand jury proceedings, see United States v. Procter & Gamble Co., 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); cf. Rule 6(d), F.R.Cr.P., but place an intolerable burden on the prosecutor and on the courts, cf. United States v. Evanchik, 413 F.2d 950, 952–953 (2d Cir. 1969). How would they ever be sure, short of turning over all grand jury testimony in each case, that there might not be some items which, with the aid of hindsight, might arguably have assisted the defense?

Thus defense counsel had strong reason to believe that Lundy's testimony would be helpful to the defense and he so argued to the jury. Yet he did not subpoena Lundy to testify, as he had a right to do, and he did not advise the court of any inability to elicit Lundy's testimony. We hold that under the circumstances it was not an abuse of discretion for the trial judge to deny him disclosure of the Lundy-Sheridan grand jury testimony.

II. *The Other Contentions*

We find no merit in appellant's contention that the evidence was insufficient to support the verdict. As to Count One, there was ample independent evidence that Ruggiero understood that the $2500 received by him was to be "passed on," including the testimony of Itkin that Ruggiero used the words "pay off a commissioner" and that of Marcus as to Ruggiero's annoyance at their having fixed the price before ascertaining "how much it will cost in Albany, what Lundy will charge?"

As for the second count Ruggiero testified repeatedly before the grand jury

that he received the $2500 from Itkin and Marcus as a fee for his own services as an attorney in representing Carey before the Public Service Commission and, more specifically, in inducing Albano to explain the background of the pending application to Commissioner Lundy and to arrange an introduction to Lundy so that Ruggiero could also discuss the application. Furthermore, Ruggiero flatly denied before the grand jury that he had paid any money to Lundy. Against this background it is clear that in answering "Yes" to the question whether he had received the $2500 "to exert [his] influence . . . and the influence of Albano" he was reaffirming his grand jury testimony to the effect that he was to use a lawyer's lawful influence. From the evidence introduced at trial, including Marcus' and Itkin's testimony, the jury could have concluded beyond a reasonable doubt that the $2500 was earmarked to be used as a bribe rather than merely to induce Ruggiero to use his own influence as a lawyer and that of Albano. We are not therefore dealing here with a literally true but misleading answer. See Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (Jan. 10, 1973).

Finally as to the third count, relating to Ruggiero's knowledge of McCarthy's involvement, the argument that Ruggiero's answers merely indicated a faulty recollection is contradicted by the testimony of Rappaport and Itkin. If the jury had believed Ruggiero, a guilty verdict would have been precluded by Judge Ryan's charge that "a faulty memory or recollection or a misunderstanding of the question or their import . . . would negate wilfullness on the part of the defendant." Additionally, in charging the jury on credibility of witnesses, Judge Ryan stated, "Remember at all times, that the memory of a man, recollection of a man on occasions is faulty, and because it is faulty and not correct, it may cause him to make an innocent

mistake. We are not concerned with . . . innocent mistakes . . . [but with whether a witness did] deliberately lie as to any material fact."

■ Appellant's constitutional claims must similarly fall. It is alleged that the removal by 18 U.S.C. § 1623(e) [4] of the "two-witness rule" or "corroboration rule" for perjury cases violates the confrontation clause of the Sixth Amendment. While it is true that the "two-witness" rule has long prevailed in the federal courts, it is not one of constitutional dimension. See Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L. Ed. 495 (1945); Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L. Ed. 1118 (1926). In *Weiler*, the Court adhered to the rule in the absence of an "enactment in derogation of it." 323 U.S. at 610, 65 S.Ct. at 548. Here Congress has specifically provided that "[I]t shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence." As the rule is not of constitutional dimension, Congress' judgment controls.

■ Ruggiero also claims a denial of equal protection in the prosecutor's decision to proceed against him under § 1623 rather than under 18 U.S.C. § 1621, the general perjury statute, which requires the "two-witness rule" and authorizes less severe penalties. The answer to this claim of discriminatory prosecutorial enforcement, see Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), lies in the settled rule that where criminal statutes overlap the government is entitled to choose among them provided it does not discriminate against any class of defendants. See, e.g., United States v. Eisenmann, 396 F.2d 565, 568 (2d Cir.1968). No such class discrimination is shown here.

■ Also without merit is Ruggiero's contention that it was reversible

---

4. See note 1 *supra*.

error for Judge Ryan to refuse to ask at the jury voir dire "whether any of the persons have served on a grand jury or another jury on another occasion." While it would not have been improper to make such an inquiry, matters of this kind are within the sound discretion of the trial judge, which was not abused here. See Bellard v. United States, 356 F.2d 437, 439 (5th Cir.), cert. denied, 385 U.S. 856, 87 S.Ct. 103, 17 L.Ed.2d 83 (1966) (where the refusal to ask such a question was sustained, albeit in a case which did not charge perjury before a grand jury).

Ruggiero's final point is that it was reversible error to admit testimony of Itkin, Rappaport and Marcus regarding their conversations with Jack McCarthy out of Ruggiero's presence, since the statements were excludable as hearsay. We conclude that the testimony was properly admitted. First of all, the testimony (e.g., McCarthy's statement of what Carey wanted), albeit challengeable as hearsay, was admissible as relevant proof of background operative facts. See United States v. Manfredonia, 414 F.2d 760, 765 (2d Cir. 1969) (statements admissible to show explanatory introductory matter). See also State v. Sweeney, 180 Minn. 452, 231 N. W. 225 (1930) (conversation of person who offered bribe to defendant regarding arrangements with others to offer the bribe admitted as "verbal acts"); McCormick on Evidence § 249 at 589 n. 78 (2d ed. 1972). Moreover, in view of the proof that McCarthy, Itkin, Marcus, Sheridan and Ruggiero were confederates or co-conspirators, testimony as to McCarthy's out-of-court utterances was admissible in the trial judge's discretion, even though the indictment did not charge a conspiracy. United States v. Annunziato, 293 F.2d 373, 378 (2d Cir. 1961).

The judgment of the district court is affirmed.