THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEO JOHN MEAGHER, JR., Defendant-Appellant.

Third District   No. 77-415

Opinion filed March 14, 1979.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Frank Yackley, State's Attorney, of Ottawa (Robert C. Perry, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

Following a jury trial, judgments of conviction for two counts of aggravated kidnapping and two counts of aggravated battery were entered against the defendant, Leo John Meagher, Jr. The circuit court of La Salle County sentenced defendant to three years probation on each count, the sentences to run concurrently. As a condition of probation, defendant was to serve a term of periodic imprisonment for six months.

The charges were based upon an incident occurring in Earlville,

Illinois, on August 28, 1976. Melvin Cronin, a part-time police officer for Earlville, testified that on the evening of that day he had a meeting with Police Chief Owen Finnegan in the parking lot of the Earlville high school. Finnegan told Cronin that friends of his would be driving through Earlville that evening in a dark green Charger and that he did not want Cronin stopping them. Finnegan explained that he would stop the vehicle for a routine traffic stop and then radio for Cronin to come by to see the car he was to leave alone. Later, Finnegan radioed Cronin and gave him his location. Finnegan was standing at the driver's side of the automobile as Cronin drove by. Although Cronin in a prior sworn statement stated that he never really got a good look at the front seat passenger, at trial he identified defendant as that passenger. Cronin recognized defendant because he had previously met him at Finnegan's home.

Several other State witnesses testified that on the evening of August 28 they observed Finnegan talking to the driver of a dark green Charger. One witness stated that one of the individuals in the car looked like the defendant.

During the course of the evening, three men, Hovious, Little, and Stults, were stopped by the occupants of a green Charger and Little was questioned at gun point as to the whereabouts of three individuals named Fultz, Kuntz, and Wittaker. A canister of mace was displayed by one of the assailants. During the questioning, Fultz and Kuntz drove by in another vehicle and were pointed out to the assailants, who returned to the green Charger and pursued the Fultz vehicle.

Scott Fultz testified that on August 28 at about midnight he and Mat Kuntz were driving through Earlville when a green Charger approached them. One of the passengers leaned out and pointed a gun at them. After Fultz stopped his car, the three occupants of the Charger got out of the car armed with guns. Fultz noticed one of them had a canister of mace in his shirt pocket. Fultz identified People's exhibits 11 and 12 as similar to the canister he observed. After Fultz identified himself, one of the assailants drove the Fultz car into the country while holding a gun on Fultz and Kuntz. The other car followed. After the two cars stopped and everyone got out, Fultz and Kuntz were told by one of their assailants that he did not like rocks being thrown at cars and cars being painted. He said they were going to straighten out the town of Earlville. The assailants put away their guns and two of them took baseball bats out of their car and started swinging at Fultz and Kuntz with the bats and their fists. Fultz received a blow on the back which he thought came from a baseball bat. Kuntz ran away with shots being fired in his direction as he left. Fultz was told to walk down the road and after walking some distance, he ran into a corn field and escaped. Neither Fultz nor Kuntz could identify any of their assailants.

According to Cronin, on the following day, August 29, Finnegan called Cronin at his home concerning a possible change in work shifts. At that time Finnegan told Cronin that some boys from Earlville had been roughed up a bit the night before by some of his friends. Cronin testified over defendant's objection that Finnegan said one of the individuals involved was the individual Cronin had met at Finnegan's home the previous week. From the context of Cronin's testimony, all concede that this reference was to the defendant. Finnegan also told Cronin he would not be implicated in the incident in any way.

Cronin talked to other police authorities and the state's attorney and based upon his information, the La Salle County Sheriff's Department obtained an arrest warrant for defendant and a search warrant for his home and his automobile. After arresting the defendant, authorities executed the search warrant and discovered several canisters of mace later identified at trial as being similar to the ones used by the assailants of Kuntz and Fultz. Defendant was read his Miranda rights upon arrest and again before he gave an oral statement. Defendant stated he went to Earlville that night with Bill Fredericks and John Marincic in a green Charger in order to teach "those kids" a lesson. Defendant admitted to holding a can of mace. He explained his actions were motivated by a rock-throwing incident. A week before kids had thrown rocks, stones and bricks at the squad car he and Finnegan were riding in. Defendant refused to give a written statement. Two police officers were present when the oral statement was given.

John Marincic was arrested and his green Charger seized. At trial his car was identified as being similar to the one seen in Earlville on August 28 except it was without wide tires, white stripe and a C.B. antenna that some witnesses stated were on the assailants' car.

Defendant presented an alibi defense. Defendant, his wife, Virginia Fredericks, William Fredericks, and John Miller all generally testified that on August 28 defendant arrived at the Fredericks residence at about 8 p.m. and did not leave until 3 a.m. the next morning. The State impeached William Fredericks by means of a 1968 burglary conviction. The State presented evidence that statements given by the defendant's various alibi witnesses, apparently prior to trial, were typed by Mrs. Fredericks.

Defendant took the stand in his own behalf and denied leaving the Fredericks home on the evening of August 28, and denied any participation in the crimes. While defendant admitted being in Earlville with Finnegan on several occasions prior to August 28, he denied making any statement to police about the incident.

Finnegan took the stand and generally denied arranging to have Kuntz and Fultz "beat up." In his conversation with Cronin on August 28,

Finnegan did not tell Cronin that defendant was involved in the incident. Finnegan denied telling John Gunderson, the assistant chief-of-police of Earlville, that the abductors screwed up by ordering the boys to leave him alone.

John Gunderson testified that on September 1, 1976, he and Finnegan were looking for a subject who had escaped from custody. At that time, Finnegan told Gunderson he had done it and that he had screwed up by stopping the car in which the abductors were riding.

Prior to trial, defendant filed a motion in limine asking the court to deny the admission of Cronin's testimony concerning out-of-court declarations by Finnegan implicating the defendant. The trial court believed that a declaration by a co-conspirator after the crime was fully executed is admissible against any co-conspirator if the declaration was made for the purpose of covering up the commission of the offense. Accordingly, at trial the court allowed Cronin's testimony as to Finnegan's declaration once the State had established a proper foundation. On appeal the defendant asserts error in the trial court's ruling.

■■ The co-conspirator exception to the hearsay rule is well known. The acts and declarations of a co-conspirator in furtherance of the conspiracy are admissible against another who is a defendant, even when the acts and declarations are made out of the presence of the defendant. (*People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975.) No conspiracy need be charged and so long as a prima facie case of conspiracy has been shown by independent evidence, acts or declarations in furtherance of the conspiracy are admissible. See *People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975; *People v. Morrow* (1976), 40 Ill. App. 3d 1020, 353 N.E.2d 354.

■■ The requirement that the act or declaration be in furtherance of the conspiracy has engendered a corollary to the co-conspirator rule. While the acts and declarations of one conspirator during the existence of a conspiracy are competent evidence against his co-conspirators, no act or declaration before the beginning or after the termination of the conspiracy is admissible against a nondeclaring co-conspirator. (*People v. Meisenhelter* (1942), 381 Ill. 378, 45 N.E.2d 678.) The issue before us is whether a conspiracy terminates with the commission of the underlying offense or does it continue thereafter to include acts or declarations directed at concealing the substantive offense. The rule against admitting post-conspiracy statements is uniform, but decisions vary as to when a conspiracy ends.

■■ Federal courts consider a conspiracy terminates with the commission of the underlying offense, but constitutional restrictions do not prevent the States from adopting a different rule which considers concealment of the underlying offense as a part of the conspiracy. (See *Dutton v. Evans*

(1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210.) A number of States subscribe to the theory that a conspiracy includes not only acts and declarations contemporaneous with commission of the underlying criminal offense, but also acts and declarations directed at concealing their crime. (See, *e.g., Reed v. People* (1965), 156 Colo. 450, 402 P.2d 68; *Dailey v. State* (1937), 233 Ala. 384, 171 So. 729; *State v. Roberts* (1915), 95 Kan. 280, 147 P. 828.) According to Wharton, Criminal Evidence §430 (12th ed. 1955), admission of such evidence is based on a theory that once the substantive offense has been committed, the conspirators are as much concerned with their freedom from apprehension as they initially were with the commission of the crime.

While Illinois law seems clear that post-conspiracy statements are inadmissible against a nondeclaring co-conspirator, issues relating to the termination of a conspiracy have been seldom considered.

The State relies on *People v. Konkowski* (1941), 308 Ill. App. 470, 32 N.E.2d 352, to support its position. There, the court quoted from several Georgia decisions adherring to the rule that concealment of the crime is a part of the conspiracy. However, the opinion is ambiguous as to whether the court adopted the holdings of those decisions or considered the error waived by defendant's failure to raise it at trial. A more recent case is *People v. Daniels* (1968), 92 Ill. App. 2d 207, 235 N.E.2d 305. In *Daniels* the co-conspirator stated to the witness that he and the defendant "had just killed, took George Lemon and killed him." The co-conspirator also told the witness that he and defendant were going back out to dispose of the gun. The court held that these statements were admissible, but did so on the theory that they consisted of verbal expressions of one co-conspirator accompanying or explaining other acts of a plan or common design. Examination of the authorities relied upon by the court in *Daniels* do not support the court's pronouncements.

In comparison to the foregoing authorities are several decisions eminating from *Spies v. People* (1887), 122 Ill. 1, 12 N.E. 865. *Spies* stated, "Declarations that are merely narrative as to what has been done or will be done are incompetent, and should not be admitted except as against the defendant making them or in whose presence they are made." (122 Ill. 1, 237, 12 N.E. 865, 980.) However, *Spies* does not suggest what statements might constitute narrative. The opinion in *Samples v. People* (1887), 121 Ill. 547, 551, 13 N.E. 536, 538, states:

> "[T]he declaration, to be admissible, must not only be made during the pendency of the criminal enterprise, but also in furtherance of its objects. A mere narrative to a stranger, related during the pendency of the criminal enterprise, but of a past event or occurrence, is just as objectional as if related after the criminal enterprise has terminated."

Of more recent vintage is the decision in *People v. Simpson* (1976), 39 Ill. App. 3d 318, 349 N.E.2d 441. There the court held inadmissible in a defendant's trial a statement by an alleged co-conspirator to the witness that "we" had just hit the laundromat, on the theory that the State had failed to prove by independent evidence a prima facie case of conspiracy, and the statement was merely narrative of what had already been done.

In the present case, defendant objects to testimony of the telephone conversation Finnegan had with Cronin in which the defendant was implicated. After considering the various authorities set forth above, we believe Finnegan's statement implicating the defendant falls within the co-conspirator exception to the hearsay rule.

First, the State established a prima facie case that two or more persons were engaged in a common plan to accomplish a criminal goal and the evidence supporting the prima facie case was independent, as it must be, of the declaration sought to be admitted against the defendant. Without referring to all the independent evidence indicating the existence of a conspiracy, we note Finnegan's efforts at persuading Cronin not to stop a certain car, Cronin's identification of the defendant as a passenger while Finnegan was talking to the occupants of the car, and testimony of the defendant's oral confession, were all evidence indicating a conspiracy. As to whether the conspiracy terminated with the commission of the underlying criminal objective, we believe the better view to be that a conspiracy includes subsequent efforts at concealment, but only if those efforts are proximate in time to the commission of the principal crime. When acts or declarations directed towards concealment are distant from the commission of the offense, they are subject to such grave doubts as to their trustworthiness that they should not be admissible under the co-conspirator exception. Here, the telephone conversation between Finnegan and Cronin came the morning following the attack on Kuntz and Fultz. We believe such to be proximate in time to the commission of the underlying offense.

Defendant argues that even assuming the co-conspirator exception to the hearsay rule includes efforts at concealment, Finnegan's conversation with Cronin was not for the purpose of concealing the attack on Fultz and Kuntz, but only a narrative of the prior evenings events and therefore was not admissible.

Decisions concerning "narrative" have been previously discussed. While these decisions are seemingly at odds with the position that concealment is a part of the conspiracy, they are not. The most acceptable rationale supporting each theory is the principle that the act or declaration of a co-conspirator must be in furtherance of the objectives of the conspiracy. Certainly, a mere narrative of past occurrences can not further any objective, whereas in distinction, concealment will further the

conspiracy by allowing the conspirators to escape punishment. Conflict between the two rules is bound to occur since concealment generally relates to past events, as can "narrative." Under the facts and circumstances of this case, we believe the declaration by Finnegan in his phone conversation with Cronin went beyond mere narrative and was directed towards persuading Cronin to remain silent. Such efforts at concealment were within the co-conspirator exception to the hearsay rule and hence were properly admitted.

Defendant next contends that the trial court committed error by allowing impeachment of one of defendant's alibi witnesses by means of convictions that were more than 10 years old. Defendant initially filed a motion in limine to prevent the State from introducing the convictions, but the motion was denied by the trial judge. At trial, the defendant chose to introduce evidence of his witness's prior convictions on direct examination, apparently for reasons of strategy. We believe that such action is fatal to defendant's claims on appeal. Having volunteered on direct examination testimony concerning the convictions, even though in anticipation of impeachment by the State, defendant cannot claim error on appeal. *People v. Burris* (1969), 116 Ill. App. 2d 79, 253 N.E.2d 628.

For the foregoing reasons the judgment of the circuit court of La Salle County is affirmed.

Affirmed.

ALLOY and STENGEL, JJ., concur.