THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JEROME "FATS" WHITE, Defendant-Appellant.

Fourth District   No. 4—83—0206

Opinion filed February 21, 1984.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

Defendant was charged by a multicount indictment in the circuit court of Champaign County with the offenses of murder, armed robbery, conspiracy to commit murder, and conspiracy to commit armed robbery, in violation of sections 9—1(a)(3), 18—2, 9—1(b)(5), and 8—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(3), 18—2, 9—1(b)(5), 8—2). The death penalty was sought under two of the murder counts. Also charged in the same indictment were defendant's brothers, Derrick White and Michael Johnson, and one of defendant's prostitutes, Bernice Caldwell. The record does not disclose when or how defendant's case was severed from his codefendants (his first motion for severance was denied), but he was tried separately. A jury, impaneled for that purpose, found him guilty of murder and conspiracy to commit murder, but not guilty of armed robbery. Defendant waived a jury as to the death penalty aspect of the case and submitted the matter to the trial judge, who sentenced him to life imprisonment. This appeal followed.

All of the charges arose out of an incident which occurred in the early morning hours on August 6, 1982, at a rest area on Interstate Route 57 near Pesotum, Illinois. Waymond Jackson and Donald Stewart were shot and robbed at that time and place. Jackson died as a result. The general background of the matter revolves about the efforts of rival pimps and their prostitutes to control the rest area.

On appeal defendant raises a variety of issues: (1) reasonable doubt; (2) evidentiary errors; (3) selection of a "death qualified" jury; and (4) excessive sentence. The State's case was largely circumstantial and hence subject to the infirmities inherent in all such cases. However, after a careful review of the entire record, we find no basis for upsetting the jury's verdict nor the trial judge's sentence.

The issues of reasonable doubt and admission of evidence are interrelated, and given the circumstantial nature of the case and the large number of witnesses who testified, it is difficult to piece together a coherent narrative of events. We start with the proposition, sustained by the record, that defendant was a pimp and that Bernice Caldwell, also known as Ebony Wells, was one of his prostitutes; and

that the victim, Waymond Jackson, was also a pimp with his stable of prostitutes. Much of the State's evidence related to events and statements made during the months and weeks prior to the homicide. During most of this period defendant was committed to the Department of Corrections in which he was serving a 364-day sentence for a traffic offense. He became a resident of the Urbana Community Correctional Center on October 31, 1981, and remained there until March 1, 1982. This is a work-release center housing felons and misdemeanants who are serving the last four to six months of their sentences. For reasons not stated in the record, defendant was transferred out of the center and ultimately released from the Department of Corrections on July 22, 1982.

Initial evidence given by police officers established the discovery of two bodies on the ground in the rest area and two vehicles parked one behind the other. Several women were running about the area. Waymond Jackson was dead and Donald Stewart was suffering from a head injury. A police dispatch stated that suspects involved in the case were headed north on the interstate in a silver-colored, late model car. Other officers stopped such a car for a headlight violation. Allen Walker was driving and Doyle Johnson was a passenger. They were arrested for not having a firearm owner's identification card when the officers observed a round of live ammunition on the rear floorboard of the car. An employee of a rental car agency in Champaign testified that on August 5, 1982, the day before the occurrence, she rented a 1980 silver Malibu to Bernice Caldwell. She identified a photograph of the car driven by Allen Walker as the one she rented to Caldwell.

Doyle Johnson fell asleep shortly after his arrest. At the time of his arrest, Johnson had in his possession $187. Walker possessed $154. It was stipulated that no gunshot residue was found on Walker's or Johnson's hands and that wearing gloves would prevent such residue from being deposited on the hands. The medical evidence established that Waymond Jackson died as a result of a shotgun wound to his head. Donald Stewart suffered trauma to his brain and was partially paralyzed on his right side as a result of a bullet wound to the left side of his head.

Doyle Johnson was the State's principal witness. He acknowledged that he had been charged with the murder of Waymond Jackson, attempt (murder) of Donald Stewart, and conspiracy to commit murder. He had pleaded guilty to murder and attempt (murder) and as part of the plea agreement, 30 years' imprisonment was imposed. A further part of the agreement was that he would first go to a Federal penitentiary on an unrelated offense and then to an Illinois mini-

mum security institution. In return, he agreed to testify against defendant.

Johnson stated that he had had a conversation with defendant in Chicago at approximately 8:30 p.m. on August 5, 1982. Defendant stated to him that Bernice Caldwell had a conflict with a man in Champaign and that he could make some money. Defendant was also seen talking to Allen Walker. Thereafter, defendant, Caldwell, Walker, and Johnson drove to Champaign.

During the journey, defendant stated that he and Caldwell wanted the man with whom they had a conflict taken "out of the game" or killed. In return, Walker and Johnson were to be paid $1,000 each. Defendant told them that the man would probably be at the truck stop and described the blue and white Cadillac he would be driving.

Johnson fell asleep in the car 30 minutes after leaving Chicago. He claimed that he had not had much sleep and had used heroin, cocaine, and angel dust at about 4:30 that afternoon. Upon arriving in Champaign, the group entered a home Johnson had never seen before. Defendant and Bernice Caldwell went into a bedroom and shortly thereafter called for Johnson and Walker to join them. Defendant furnished them with two pairs of gloves, a sawed-off shotgun, and a .357 handgun, and told them to use a silver car that was parked in the garage. They took the weapons and began to drive to the truck stop. Johnson claimed that defendant and Caldwell followed behind until they approached the expressway leading to the truck stop.

Johnson and Walker drove up to a blue and white Cadillac parked at the truck stop; Walker, who was driving, stopped and asked for directions to Chicago. They left after obtaining directions but returned several minutes later. There was another car parked next to the Cadillac with women later identified as Shirley Bond, Angela Andujo, and Gabrie Davis, seated in both vehicles. Walker, armed with the sawed-off shotgun, ordered everyone to get out of the vehicles and grabbed Waymond Jackson; Johnson grabbed the other man, Donald Stewart. Walker ordered the men and women to lie face down on the pavement and then asked Jackson for his money. Stewart also gave Johnson his money. After Walker shot Jackson once in the head, Johnson fired two shots at Stewart with the .357 revolver.

After they had shot the two men, Walker and Johnson returned to their vehicle and drove away. They headed toward Chicago, where they were told to park the car. While traveling north on Interstate 57, Johnson threw the guns and the gloves out of the window. Walker and Johnson were stopped by the police in De Witt County. They received no money for the shooting because they were not to be paid

until after their job had been completed.

One of the defendant's main arguments on appeal is the credibility of Doyle Johnson. Several things occurred following his arrest which cast reflections on it. He then told the police that Caldwell was working as a prostitute for Michael White, defendant's brother, rather than defendant, and that Michael White and Bernice Caldwell were the ones who solicited him and Walker, not to commit murder, but to commit robbery. He also told them that Michael and Bernice had furnished the weapons and silver automobile. He admitted the shooting and claimed he intended to return to Chicago, there to split the proceeds of the robbery with Michael and Bernice. At trial he stated that he had made these statements implicating Michael rather than defendant because he and defendant had been close friends for 20 years; and that he hoped that defendant would help him find a lawyer to "come out of it okay."

Johnson first implicated defendant in the crimes about five days before defendant's trial and did not do so until after Allen Walker had been convicted of murder and sentenced to life imprisonment. He stated that there was no agreement between the State's Attorney and himself at the time he stated defendant, rather than Michael, solicited him.

Another strange incident occurred while Johnson and the defendant were being held in jail, but in different sections thereof. Johnson wrote a note to defendant saying that when he and Allen Walker first went to jail they were both sick and high on drugs. The note also said that both Johnson and Walker knew that defendant had nothing to do with what happened at the rest stop. At trial, Johnson claimed that defendant was the author of the note, that he had simply copied it and sent it back to defendant in another part of the jail.

Testimony was received in the State's case from a number of harlots. Angela Andujo testified that she worked as a prostitute for Waymond Jackson. Others in his coterie were Gabrie Davis, Shirley Bond, and Carmen Lucas. Andujo was present plying her trade in the rest stop on the night of August 5, 1982. Essentially, she echoed the story told by Doyle Johnson: a silver car arrived at about 4 a.m. containing two black men; they asked directions to Chicago and left; they returned and parked next to Waymond Jackson's blue and white Cadillac; the driver got out and placed a shotgun next to Jackson's head; there were some shots and then one big blast; the men got back into the car; Jackson had a gun in his car and it was thrown into a nearby field by Gabrie Davis.

The State sought to show that there was a preexisting hostility

between Waymond Jackson on the one hand and defendant and Bernice Caldwell on the other, and that the hostility was over control. of the rest stop. Over defendant's hearsay objection Andujo was permitted to testify that one or two weeks before Jackson was killed, Caldwell, who worked for defendant, had warned Andujo that she was not to go to the rest stop without defendant's permission and that if she did work there, she would be required to give defendant one-half of her earnings. The trial court permitted the testimony on the basis that a conspiracy existed between defendant and Caldwell to control the rest stop and the testimony was probative of when it began. This will be discussed in greater detail later in this opinion. Andujo also stated that Derrick White, defendant's brother, was running defendant's prostitution business while defendant was in jail.

Shirley Bond, another of Jackson's bawds, also witnessed the shootings. Her testimony largely paralleled that of Andujo. She also described an incident which occurred on the 14th or 15th of July 1982. Derrick White and Waymond Jackson were present in the rest stop; Derrick got out of his car and began yelling at Waymond; Waymond had a gun and cocked it; the police arrived and dispersed the crowd. Later everyone returned to the rest stop and a fight began between Carmen Lucas, one of Waymond's prostitutes, and Bernice Caldwell. Lucas administered a beating to Caldwell. Bond also testified that she had heard both Waymond and Derrick upon previous occasions threaten that someone would die over the struggle for control of the area.

Gabrie Davis and Carmen Lucas also described the events of the early morning of August 6. Their testimony added nothing significantly new to what had already been said. Lucas confirmed that a few weeks prior to the shootings she had had a fight with Caldwell at the rest area. Caldwell ordered Lucas not to work there and approached with a razor; Lucas then sprayed her with Mace.

Donna Blakely and Jackie Manning were members of Derrick White's stable. They also worked the rest stop. Blakely testified that Derrick was in a hospital in Champaign from August 4 to August 7, 1982. She was present at the fight between Waymond Jackson and Bernice Caldwell, who, she said, worked for defendant. According to Blakely, Jackson told Caldwell he was upset with her, slapped her, and then administered a beating. Caldwell responded by saying "wait till my man get out." Blakely stated that a few nights later there was a fight between Carmen Lucas and Caldwell.

Eric Goff, a high school student and apparently a friend of Derrick White, testified that at Derrick's request he took Blakely and

Manning to visit him while he was in the hospital on the morning of August 6, 1982. (It will be remembered that the shootings took place about 4 a.m. on the same date.) Defendant and Bernice Caldwell were there. Goff overheard Derrick tell Blakely and Manning to tell the police that they had been at the rest area and had obtained a ride back to town by a trucker. He also told them that they had nothing to worry about. Derrick also asked Goff what he had heard, and he replied that he had heard that "two dudes got knocked off," at which point Derrick winked, smiled and nodded his head. According to Goff, defendant was not in the hospital room at the time but was out in the lobby.

As to physical evidence, the police had collected a number of items at the rest stop and along the shoulder of the northbound lanes of Interstate 57. A .357 Magnum Tarsus handgun was found at the rest stop in the grass, apparently the weapon belonging to Waymond Jackson which Gabrie Davis had thrown out on the occasion of the shootings. About four miles north of the rest stop on the Interstate, the police located the stock of a .410 gauge shotgun, the butt portion of a .410 gauge shotgun, and a .357 Magnum handgun. Considerable expert testimony was received indicating that the guns found along the shoulder were the weapons used in the shootings.

The provenance of the weapons was then recounted by various witnesses. Michael Foster stated that he had borrowed a shotgun from a relative in Kentucky. In December 1982 he had loaned the gun to Eddie Pelmore. He identified those parts which had been found along the Interstate as coming from that gun. He also stated that when he loaned the gun to Pelmore, the barrel had not been sawed off.

Pelmore, who operated an auto body shop in Rantoul, was defendant's employer during his stay at the work release center. He was also responsible for transporting defendant to and from work. He testified that in January 1982 he had had trouble with his truck while giving defendant a ride. He then left the truck at a residence on Cruising Lane in Champaign and at that time took the shotgun inside the residence for safekeeping. After going inside, he saw there Bernice Caldwell, whom he knew only as Ebony. She instructed him to place the gun under a bed in the house. Later he requested the return of the weapon, but Caldwell refused, saying that defendant had instructed her not to give it to anyone. Prior to Pelmore's testimony, the defense moved *in limine* to exclude the testimony regarding defendant's instruction to Caldwell as being hearsay and antedating any conspiracy. The trial court denied the motion.

Another witness testified that he had owned a .357 Magnum handgun which had been stolen from his car in August 1982. A second witness, who had been granted immunity in return for his testimony in this case, stated that he had stolen the gun and sold it to Bernice Caldwell for $100. The sale apparently took place at the Cruising Lane address; the witness stated that defendant was not present in the house at the time.

The supervisor of the work release center testified and confirmed much previous evidence: defendant became a resident of the center on October 31, 1981, remained there until March 1, 1982, and was ultimately released from the Department of Corrections on July 22, 1982. He stated that Eddie Pelmore was defendant's employer, volunteer driver, and supervisor during his stay at the center.

An agent of the Illinois Department of Criminal Investigation and a team of officers executed a search warrant at the residence at 1609 Cruising Lane. The agent testified as to a number of items found there which tended to indicate that defendant had been a resident, although the house was unoccupied and had a for-sale sign in the yard at the time. He further stated that defendant had been arrested in Benton Harbor, Michigan, on August 22, 1982, and that Bernice Caldwell had been arrested in Chicago on January 25, 1983.

Theresa Caldwell, Bernice Caldwell's daughter, testified that in August 1982 she lived at 1609 Cruising Lane in Champaign. She heard about the shootings on I-57 during the morning hours of August 6, 1982. The previous night her mother, defendant, and two other people were in the house; she did not hear them talking; she did not know how long it took to get from Chicago to Champaign by car; she saw her mother in the house on August 5 at approximately 10 p.m.

In broad outline, that was the State's case. The defense presented several law enforcement officers.

Walter Wolfe, deputy sheriff for Champaign County, testified. During his interrogation of Gabrie Davis, Davis told him:

"The shooting was all over whose area the rest stop was, that Derrick White and Waymond Jackson had been arguing for some time over whose area it was, that Ebony and Carmen had gotten into a fight during this argument between Waymond and Derrick, and that Carmen had whipped Ebony in the rest area *** during this fight Derrick had told Waymond he would die here, and Waymond replied that he knew he would die in Champaign County because he was born there."

David Jackson, an Illinois State police officer, testified that Shir-

ley Bond had told him at the rest area that the two suspects had robbed the girls of their purses and the men of their cash.

Michael Robb, who previously had testified for the State, testified that, during his interview of Shirley Bond, she had told him that on one occasion Derrick White had threatened Waymond Jackson and told him that Jackson's women were making all the money and there was going to be a lot of "s--t" over this and that perhaps Waymond Jackson and his women would get "taken out." Shirley Bond also said that Derrick White had stated "f--- this bullshit, I kill anyone who f---- around in this truck stop." According to Shirley Bond, Derrick White also told Waymond Jackson, "Nigger, you're going to die here."

Charles McGrew, a special agent with the Division of Criminal Investigation for the Department of Law Enforcement, testified that during his interview of Doyle Johnson following Johnson's arrest, Doyle Johnson testified that he and Allen Walker were going back to Chicago to split the money with Bernice Caldwell and Michael Johnson.

As has been indicated, the jury returned verdicts of guilty of murder and conspiracy to commit murder and not guilty as to the armed robbery counts.

■■ Defendant's first issue is that of reasonable doubt. He maintains that the principal evidence against him came from Doyle Johnson, an accomplice, whose testimony was uncorroborated, impeached, and unworthy of belief. He points out the many weak, inconsistent, and bizarre elements in Johnson's testimony which have been set out at length above: his first story of being approached by Michael White, rather than defendant; the note in the jail; the plea agreement in return for testimony; the statement that he was high on drugs and alcohol at the time of the murder. He also claims there was no corroboration of Johnson's testimony; that while there might have been an escalating hostility among Waymond Jackson, Bernice Caldwell, and others, he was incarcerated during most of that time; that the only evidence to link him to the weapons was that of the discredited Doyle Johnson; that the only corroboration was what occurred during the murder itself and who did the shooting.

We disagree. It is true that there was much to undermine Johnson's testimony, but this was thoroughly explored before the jury. While an accomplice's testimony may have myriad infirmities, these go to the weight and not the admissibility of the evidence. *People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422.

■ In this case the jury was apprized fully of all matters bearing on Johnson's credibility and chose to accept his version of the events

leading up to the murder. We find no basis to set aside their finding.

As to corroboration, in our opinion it was adequate. Without detailing everything in the lengthy factual statement above, we would point out Theresa Caldwell's testimony of seeing defendant, her mother, and two strangers in the house on the evening of August 5; defendant's part in obtaining the shotgun and ordering it not be returned; the testimony of the prostitutes which largely paralleled that of Johnson; the physical evidence indicating that defendant had control of the premises at 1609 Cruising Lane. Even without corroboration, an accomplice's testimony is not barred as a matter of law. *People v. Johnson* (1968), 93 Ill. App. 2d 184, 236 N.E.2d 388.

■ Defendant's next issue concerns the admission of certain declarations which he claims were hearsay. The question resolves itself into an examination of the so-called "co-conspirator" exception to the hearsay rule.

To recapitulate briefly, the statements are: (1) Andujo's statement that Caldwell told her one or two weeks before the murder that she was not to work the rest stop, and if she did, she would be required to give defendant one-half her earnings; (2) Blakely's statement that after Waymond Jackson had administered a beating to her in July 1982, Caldwell said "wait till my man get out"; and (3) Caldwell's statement to Pelmore that defendant had instructed her not to give the shotgun back to anyone.

Initially we note that item (2) was not objected to at trial and was not raised in defendant's post-trial motion. We might therefore well consider the point waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) However, since all three statements concern the same basic question of law, and a novel one at that, in our discretion we decline to consider waiver and will deal with the issue on its merits.

The same is essentially true of item (3). It was subject to a motion *in limine* at the trial level, but not raised in the post-trial motion. As has been indicated, the trial court denied the motion *in limine*, apparently upon the prosecutor's representation that he did not intend to introduce the statement for its truth but only to show that defendant had joint possession of the premises with Caldwell. Defense counsel expressed apprehension that the statement would be used by the prosecutor in closing argument, but the prosecutor assured him that he would not. This assurance was breached, however, when the prosecutor stated in closing argument:

> "This man can get things done, and he did, particularly with respect to Waymond Jackson. Pelmore can't get his gun back from Ebony. As I recall the evidence in the testimony, he indi-

cated the reason he couldn't was because Fats wouldn't let her give the gun back.

\* \* \*

We know that other witnesses have indicated the guns went to Ebony and Jerome. You remember Pelmore can't even get his gun back."

While we will not be understood as condoning the prosecutor's violation of his word as an officer of the court, yet there was no objection to the statement by defense counsel, who, in fact, also used this evidence in his closing argument. We will consider the statement on its merits.

Defendant's principal argument is that he was charged with conspiracy to commit murder; that any statements by a co-conspirator made prior to the genesis of the conspiracy are inadmissible hearsay; that in this case the conspiracy to commit murder did not arise until defendant and Caldwell made the trip to Chicago on August 5; therefore, all three statements having been made from one month to seven months prior were inadmissible. The theory has some plausibility, but it ignores the fact that any uncharged conspiracy may exist as the predicate for admissions and statements of co-conspirators. For example, in *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801, the specific charges were aggravated kidnaping and aggravated battery, but the court held admissible declarations by co-conspirators in an underlying, uncharged conspiracy. So also it was in *People v. Jaffe* (1978), 64 Ill. App. 3d 831, 381 N.E.2d 1018, where the specific charge was unlawful delivery of cannabis.

As to the fundamental rule in this area, an excellent statement is found in *Meagher*:

"The co-conspirator exception to the hearsay rule is well known. The acts and declarations of a co-conspirator in furtherance of the conspiracy are admissible against another who is a defendant, even when the acts and declarations are made out of the presence of the defendant. (*People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975.) No conspiracy need be charged and so long as a prima facie case of conspiracy has been shown by independent evidence, acts or declarations in furtherance of the conspiracy are admissible. See *People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975; *People v. Morrow* (1976), 40 Ill. App. 3d 1020, 353 N.E.2d 354." *People v. Meagher* (1979), 70 Ill. App. 3d 597, 601, 388 N.E.2d 801, 803.

A further explication is found in *Jaffe*:

"The co-conspirator exception 'allows acts and declarations of one co-conspirator to be admitted against another who is a defendant, even when the acts and declarations are made out of the presence of the defendant.' (*People v. Jackson* (1977), 49 Ill. App. 3d 1018, 1020.) There is no need for the State to introduce evidence of verbal or written communication between alleged conspirators to establish a conspiracy, 'where the acts themselves, subsequent to the alleged conspiracy, inferentially establish the existence of an agreement.' (*People v. Graham* (1971), 1 Ill. App. 3d 749, 752.)" *People v. Jaffe* (1978), 64 Ill. App. 3d 831, 835, 381 N.E.2d 1018, 1021.

█ The element which is not clearly articulated in these authorities is that the uncharged conspiracy must be factually intertwined with the offense charged. This statement is found in the Federal courts whose rule is basically the same as the common law rule in Illinois. Federal Rule of Evidence 801(d)(2)(E) (28 U.S.C. sec. 801(d)(2)(E) (1976)) provides:

"(d) *Statements which are not hearsay.* A statement is not hearsay if—

\* \* \*

(2) *Admission by party-opponent.* The statement is offered against a party and is \*\*\* (E) a statement by a coconspirator of a party during the course in furtherance of the conspiracy."

The distinction was set forth in *United States v. Lyles* (2d Cir. 1979), 593 F.2d 182, 194-95:

"The case before us differs in two ways from the typical criminal case in which the government seeks to introduce a vicarious admission. First, in the usual vicarious admission situation, the conspiracy which is relied upon for Rule 801(d)(2)(E) purposes either is the very crime charged or is closely related to the crime charged. It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment. *United States v. Doulin*, 538 F.2d 466, 471 (2d Cir.), *cert. denied*, 429 U.S. 895 (1976). See also *United States v. Ruggiero*, 472 F.2d 599, 607 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S. Ct. 2772, 37 L. Ed. 2d 398 (1973); *United States v. Jones*, 374 F.2d 414, 418 (2d Cir.), *cert. denied*, 389 U.S. 835, 88 S. Ct. 40, 19 L. Ed. 2d 95 (1967); *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir. 1943) (admission of such declarations 'does not depend upon the indictment, but is merely an incident of the

general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal'). However in each of the cited cases enunciating this principle the conspiracy introduced into evidence by the government, although not charged, was factually intertwined with the offense for which the defendant was being tried.

The second distinction between this case and the more usual vicarious admission case has to do with what the admission is introduced to prove. The typical vicarious admission situation involves government efforts to introduce against a criminal defendant a statement by an alleged agent or co-conspirator which tends directly to prove the commission of the crime charged. See, *e.g., United States v. DeVaugn, supra,* 579 F.2d 225; *United Sttes v. Pacelli,* 491 F.2d 1108, 1115-17 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S. Ct. 43, 42 L. Ed. 2d 49 (1974); *United States v. Calabro, supra,* 449 F.2d 885; *United States v. Rinaldi,* 393 F.2d 97, 99 (2d Cir.), *cert. denied,* 393 U.S. 913, 95 S. Ct. 43, 42 L. Ed. 2d 49 (1968). Here, in contrast, the vicarious admission was offered to establish only the performance of a similar act, *not* the commission of the crime charged. We view this distinction as crucial." (Accord, *United States v. Kendall* (7th Cir. 1981), 665 F.2d 126.)

However, a cautionary note was sounded in *United States v. Cambindo Valencia* (2d Cir. 1979), 609 F.2d 603, 641:

"We are aware of the line of cases that permits coconspirator hearsay to be admitted to prove substantive counts where no conspiracy has been charged. *E.g., United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S. Ct. 256, 50 L. Ed. 2d 178 (1976); *United States v. Ruggiero,* 472 F.2d 599, 607 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S. Ct. 2772, 37 L. Ed. 2d 398 (1973). One case involving an underlying conspiracy count cited these cases but, while pointing to 'serious potential for prejudice in the form of confusion of issues,' held that it was harmless error to admit as 'similar act' evidence the vicarious admissions of a coconspirator from a later conspiracy. *United States v. Lyles,* 593 F.2d 182, 194-96 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S. Ct. 1537, 59 L. Ed. 2d 789 (1979). Obviously, where one conspiracy is charged and proof as to others adduced, the potential for prejudice may increase, the less 'factually intertwined,' *id.* at 194, the hearsay declaration is with the offense for which the defendant is tried."

■ In applying these principles to the instant case, we are of the opinion that all three declarations were properly admitted. The defendant does not seriously question that he was involved in a conspiracy to commit prostitution. There was ample evidence of threats and intimidation to control prostitution in the rest area over a long period of time. There was also evidence from nearly all of the prostitutes that defendant was Caldwell's pimp and that Caldwell worked for him. The acts and declarations of the conspirators themselves may form the inferential basis of the existence of the conspiracy. (*Jaffe.*) Moreover, it appears clear beyond doubt that the prostitution conspiracy was factually intertwined most closely with the murder and the conspiracy to commit murder. The latter may very well be regarded as the culmination of the former. Events over a period of months moved toward their climax with all the inexorability of a Greek tragedy. No error was committed in the introduction of the three items of evidence described above.

■ As defendant's next issue he raises the familiar question as to whether a death-qualified jury (as was the case here) is also a conviction-prone jury, and therefore amounts to a denial of a fair trial. The question was recently answered in the negative in *People v. Hobson* (1983), 117 Ill. App. 3d 191, 452 N.E.2d 771, which we find controlling here.

We note in passing that the defendant made no challenge to the array, as was the case in *People v. Joyner* (1982), 109 Ill. App. 3d 1083, 441 N.E.2d 1214. However, he apparently argues that the use of peremptory challenges by the prosecution to eliminate veniremen who voiced reservations about the death penalty is a corollary to a challenge to the array. This contention was specifically rejected by the supreme court in *People v. Payne* (1983), 99 Ill. 2d 135.

Defendant relies upon *Grigsby v. Mabry* (8th Cir. 1980), 637 F.2d 525. In that case the District Court found that there were studies which supported the defendant's contention that death-qualified juries were also conviction-prone, and the circuit court held that the defendant was entitled to a hearing on the matter. However, in the instant case the record reveals only that the parties stipulated that certain evidence taken on the subject under a similar motion in the case of Allen Walker, the other accomplice from Chicago, might be considered by the trial court in this case. That testimony has not been made a part of the record in this case and we therefore decline to inquire into the matter further. Apparently it was rejected by the trial court and we have no basis upon which to review his actions.

■ Defendant's final issue is that of disparate sentences. He was

sentenced to life imprisonment; the record shows that Bernice Caldwell received 40 years' imprisonment. Defendant also claims the sentences meted out to Allen Walker and Doyle Johnson are instructive. Walker received natural life imprisonment; Johnson received 20 years' imprisonment. Johnson's sentence has no basis for comparison. As we have indicated, it was an agreed sentence pursuant to a plea agreement. Lenity was extended in return for his testimony.

Since Walker received the same sentence as defendant, all that can remain is to compare those two to Caldwell. In our opinion defendant has failed to sustain his burden of establishing that similarly situated defendants received disparate sentences. *People v. Broom* (1977), 48 Ill. App. 3d 994, 363 N.E.2d 635.

Both defendant and Walker had extensive criminal records; Caldwell did not. Defendant was the chief mover and orchestrator of the murder; Walker actually pulled the trigger; Caldwell, while not innocent, played a lesser role. Defendant was the one who solicited Walker and Johnson; Caldwell's participation was more passive.

Defendant argues section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)), which provides in pertinent part:

> "[I]f the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment."

He maintains that the trial court was swayed by the "exceptionally brutal or heinous behavior indicative of wanton cruelty" provision, and thus his sentence was based primarily on the offense itself and not on his background. Such an argument ignores the alternative provision of aggravating factors. One such factor found in section 9—1(b)(5) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(5)) is:

> "5. the defendant *** procured another to commit the murder for money or anything of value."

The judgment and sentence of the circuit court of Champaign County are affirmed.

Affirmed.

MILLS, P.J., and MILLER, J., concur.