THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS REES, Plaintiff in Error.

*Opinion filed June 24, 1915.*

1. CRIMINAL LAW—*when refusal of instruction as to considering whether witness has been offered immunity is error.* Refusal of an instruction is error which authorizes the jury, in determining the credibility of witnesses, to consider whether any witness hopes to receive any reward, immunity or benefit from the prosecution, even though an instruction stating the general rule as to accomplices is given, where two of the witnesses were not accomplices but had been promised immunity for other crimes of a similar kind if they would testify for the People.

2. SAME—*when instruction as to considering feelings of witness toward defendants should be given.* If the evidence shows that one of the witnesses for the People feels great resentment toward one of the defendants for procuring the indictment of the witness in another case, it is error to refuse an instruction containing the proposition that the jury might consider whether any witness has had his feelings or passions aroused against defendants and whether such feelings had any effect upon his testimony.

3. SAME—*jury cannot refuse to give credit to testimony which carries conviction.* An instruction stating that if the testimony of an accomplice "carries conviction and the jury are convinced of its truth they *should* give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense," is not improper because it uses the word "should" instead of "may," as the jury have no discretion as to giving credit to testimony which carries conviction and convinces them of its truth.

4. SAME—*when instruction as to presumption of innocence is not misleading.* An instruction which states that the rule as to the presumption of innocence and burden of proof in a criminal case is not intended to aid anyone who is, in fact, guilty of crime to escape but is a humane provision of the law, intended, so far as human agencies can, to prevent an innocent person from being convicted, is not susceptible of the construction that the pre-

sumption of innocence is merely for the benefit of the innocent and not of the guilty.

5. SAME—*extent to which facts stated in opinions in reported cases may be read to jury.* In a criminal case counsel may read to the jury extracts from the opinions in reported cases bearing upon the law of the case but they should not read the facts stated in the opinions, excepting that under the supervision of the court they may read enough of the ultimate facts to enable the jury to understand how the law is applied.

6. SAME—*when it is prejudicial error to permit the assistant State's attorney to read facts.* In a prosecution for burning insured goods, where one of the defendants, who is not, however, on trial, is an insurance adjuster who is charged with arranging with the defendant on trial to cause the fire, it is prejudicial error to permit the assistant State's attorney to read facts from the reported opinion in another case with which the defendant on trial was not connected, showing that the adjuster had been guilty of arranging for a fire in that case.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. C. A. McDONALD, Judge, presiding.

DARROW, BAILY & SISSMAN, (CLARENCE DARROW, of counsel,) for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, C. H. LINSCOTT, D. G. RAMSAY, and JOHN PRYSTALSKI, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The plaintiff in error, Louis Rees, owned a brick building, and the lot on which it stood, at 11,028 Michigan avenue, in Roseland, in the city of Chicago. The building had a basement and was two stories high above the ground in front and one story in the rear. The second story was occupied by him as a dwelling with his wife and three small children and was entered by a stairway in front and there was a passageway over the one-story part to the rear. The

first story was used for a clothing and furnishing store and the basement for the storage of leaf tobacco and making of cigars. The building was insured for $10,000, and the stock of goods, fixtures and personal property were insured in different companies to the amount of $17,500. On January 26, 1912, at about five o'clock in the morning, a fire broke out in the first story, in the store room, and the building, with its contents, was destroyed. Plaintiff in error was indicted in the criminal court of Cook county, together with Samuel Adelman, Israel Schaffner, Sam Fink and Joseph Clarke, and was charged with burning the stock of goods, wares and merchandise with intent to defraud the insurance companies. On motion of the State's attorney a separate trial was granted to Israel Schaffner, Sam Fink and Joseph Clarke, and the plaintiff in error and Samuel Adelman were put on trial together. The jury found both guilty, and upon motion for a new trial the motion was granted as to Samuel Adelman and refused to the plaintiff in error, who was sentenced to the penitentiary. He sued out a writ of error to review the judgment of the criminal court.

It is first contended that the evidence was not sufficient to sustain the verdict. The evidence tending to prove that the fire was of incendiary origin was, that the first knowledge of the fire came from an explosion breaking the front windows of the store so that the flames shot out into the street, that there was a second explosion shortly afterward, and that the fire was sudden, intense and immediately destructive. There was evidence for the defendants that an explosion often occurs where fire is confined for a length of time, so that the air becomes heated and expands and breaks out of the enclosed place, scattering the fire around, but there was no indication that this fire had been burning for such a length of time as to cause an explosion of that kind. It can hardly be doubted the fire was of incendiary origin.

The evidence to connect the plaintiff in error with the fire consisted of the direct testimony of witnesses, the relation of the plaintiff in error to the property and to the insurance, and proof of circumstances. Harry Brown had been employed by Joseph Clarke, an insurance adjuster, and he testified that Samuel Adelman, one of the defendants, had been in Clarke's office quite often; that a short time before the fire Adelman came into the office with the defendant Louis Rees and went into Clarke's private office; that the witness sat at a table in the reception room and there was a desk in that room occupied by the stenographer; that he heard a conversation between Adelman, Rees and Clarke, in which Adelman said to Clarke that he thought it would be a good idea to let the store go, and Clarke said it would be; that Adelman asked Clarke if it would be a good idea to burn up the place, and Clarke said it would be all right; that Clarke said it would cost $3000 to burn up the place, and Adelman said, "All right," and Clarke asked if he wanted a total loss, and Adelman replied, "Yes, on the stock;" that Rees said he was going to leave it to Adelman, and Clarke said the price would include the adjustment of the loss; that Adelman and Rees came again to the office a day or two before the fire and went into the private office, and that Adelman then asked Clarke why he did not send the men over, and Clarke said that he could not get them but would send them later. This witness said that he was under indictment for arson; that he did not know how many indictments were pending; that he had been arrested and was in jail three or four weeks; that he was offered immunity several times if he would testify, and refused, but finally agreed to testify and got out on bail; that the assistant State's attorney promised that he would not be prosecuted if he would testify against Clarke; that he had already testified three or four times, and that he had been employed three months by attorneys for the

insurance companies, at $100 a month, to investigate fires and went to a detective agency for his pay.

Ben Fink testified that he knew Harry Brown and Joseph Clarke; that he saw Clarke about two weeks before the fire and Clarke said he had a job for him out in South Kensington,—a gents' furnishing goods store,—and wanted to have a good job done; that the witness asked him how much the insurance was, and said he charged according to the insurance; that Clarke said he would give him $700 for the job, but he refused to do it for less than $1000; that Clarke told him the defendant Rees owned the store and had $30,000 insurance, but they did not agree on the pay and the witness did not do anything. This witness had been arrested in Ft. Wayne for arson and was in jail there fourteen weeks. He was charged with arson in Cook county, and the insurance companies had paid him $2000 before he would agree to testify in the arson cases. The State's attorney had promised him immunity from prosecution on his agreement to testify, and had been paying him $10 a week and paying his board in a hotel in Chicago.

Sam Fink, a brother of Ben Fink, testified that he made two trips to the place of the fire with the defendant Israel Schaffner, who was not on trial and was a fugitive; that the first time they arrived at the place at about ten o'clock at night and stood on the opposite side of the street about twenty or thirty minutes when he saw a man come out of the store and motion to them; that he came across the street and followed Schaffner into the store; that the man walked back into the store and the witness and Schaffner went into the basement, where they found eight five-gallon cans of gasoline and eight bottles of about the same capacity; that he emptied the gasoline from the cans into the bottles and cut up the cans and threw the pieces into the furnace; that he left the bottles there and went out through the back of the basement; that he saw the same man that signaled to him standing on the roof of the one-story part;

that the witness and Schaffner went to Roseland the next night about ten o'clock and saw the man motion to them; that the witness and Schaffner went into the store and the witness went into the basement, leaving Schaffner up-stairs with the man; that Schaffner came down into the basement and they waited until after three o'clock and then went up-stairs and laid papers on the floor, and the witness brought the bottles up, spilled the gasoline on the papers, and the witness threw the empty bottles in the basement and smashed them; that they walked away toward the city and saw the fire about five o'clock and he was paid for what he did; that he did not know Rees and had never spoken to him; that he was indicted for arson and was out on bonds given by a clerk in the office of the State's attorney; that he had been told that he would not be prosecuted if he would testify in the arson cases, and that he had received no money from the State's attorney or the prosecution.

The defendant Rees had been in the tobacco business fifteen or sixteen years. His practice was to go out and take orders for cigars and tobacco from dealers and the goods were delivered with a wagon. About two years before the fire he determined to erect a building and borrowed money for that purpose. Marcus Aurelius, cashier of a bank, was a witness and testified that the bank loaned Rees $12,000 to be used in building, and when it was erected Rees stocked the store with clothing and furnishing goods; that in May, 1911, Rees applied for a second loan of $7000, which was due in November before the fire, and $800 had been paid upon it, so that there was due on the two mortgages $18,200. The building and lot were worth from $23,000 to $25,000, and there was some loss by the burning of the building above the insurance of $1000 which was paid. There is no question in this case about the burning of the building except the probability of some loss from the fact that the defendant borrowed $12,000 to erect the

building.  There was evidence that before the fire the front window shades were always left up and there was a light in the store, while they were down and there was no light in the store at the time of the fire.  The stock of merchandise, with furniture and fixtures, was insured to the amount of $17,500, and the proofs of loss made by Rees showed the value of the property destroyed to be $24,048.  Joseph Clarke acted as adjuster and a settlement was made at sixty per cent of the amounts of the policies,—less than one-half of the value of the property according to the proofs of loss and the testimony of Rees on the trial.  He received $10,-550, and his explanation was that he accepted that sum to save litigation.  The defendant Samuel Adelman was a brother-in-law of Rees and was a partner in a wholesale clothing firm from which Rees bought goods.  Early in the morning of the fire word was sent to Adelman, and he telephoned Joseph Clarke, and they went in Clarke's automobile to the place of the fire.  There were a number of adjusters there who wanted to represent Rees in the settlement of the fire loss, but he told them it was in the hands of Adelman and he had already selected Clarke.  In the spring after the fire Rees re-built the building and made two stores of it, renting one and using the other for his tobacco business and abandoning the clothing and furnishing business, which the evidence tended to prove was not profitable.

As against this evidence tending to prove the defendant Rees guilty, Samuel Adelman denied that he was ever in Clarke's office with Rees before the fire or that he had any such conversation as Brown testified to or had anything to do with the fire, but said that he was well acquainted with Clarke and occasionally went to his office; that he learned of the fire about six o'clock in the morning and went to the place with Clarke, where he found Rees, with his wife and children in their night clothes and greatly excited.  The defendant Rees denied that he caused the fire or had anything to do with the burning of his store or knew Joseph

Clarke or was ever in his office before the fire, although he was there afterward in adjusting the loss, and said that he usually left a light in the store at night, and as far as he knew the store was left in the same way. the night of the fire; that he never knew Schaffner or Sam Fink, and he contradicted the testimony of Sam Fink about his signaling Schaffner and Fink or having anything to do with them. At the time of the fire Rees and his wife and children came down the front stairway in their night clothes, and it is argued that he could not have planned to burn his building when it would have been quite likely to have caused the death of himself or his family. The evidence, however, is susceptible of the conclusion that he did not expect the building to be burned, as the evidence of the agreement with Clarke was that there was to be a total loss on the stock, and it is quite likely that the fire proved more destructive than they anticipated. Sam Fink was an accomplice, and under the oft-repeated rule his testimony was subject to grave suspicion, and Ben Fink and Harry Brown, although not accomplices, had been promised immunity for other crimes of the same kind and their credibility was very seriously affected by that fact. The evidence incriminating Rees, however, was not confined to their testimony, and in cases like this, where secrecy is essential to success, it can not be expected that the People can produce witnesses of high character and blameless life to prove the crime, unless there should be some mishap in carrying out the plan or some unlooked for occurrence. The fire was an incendiary one, and the evidence, in our opinion, was sufficient to authorize the verdict.

The defendants offered, and the court refused, the following instruction:

"In weighing and considering the credibility of witnesses the jury should consider whether any witness has become interested or hopes to receive any reward, immunity or benefit from the prosecution of the case, or has in any

other way become interested or had his feelings or passions enlisted against the defendants; and if the jury shall find that any such witness has sustained or does sustain such relation in the case as would naturally tend to interest him, then it is the duty of the jury to consider whether such feelings or interest of such witness has had any effect upon such of his testimony as is material to the issues in this case."

It scarcely need be said that the fact of a witness having been promised immunity from prosecution for crime on condition that he will testify for the People must be considered in weighing his testimony. (*Conley* v. *People,* 170 Ill. 587.) Sam Fink was an accomplice and had been promised immunity from prosecution in this particular case, and Harry Brown and Ben Fink had been promised immunity for other crimes, which were material facts to be considered by the jury in determining whether they were entitled to credit as witnesses. It is suggested that as to Sam Fink the rule contained in the refused instruction was included in instruction 10 which was given and which stated the general rule concerning the testimony of an accomplice, but if that is so it does not answer the objection as to Harry Brown and Ben Fink, who were not accomplices and had been promised immunity in other cases. It is said that the subject of the credibility of Harry Brown and Ben Fink was covered by instruction 18, which was a general instruction stating the duty of the jury to consider various things, including the interest of the witness in the outcome of the case and the manner in which he might be affected by the verdict. Neither Harry Brown nor Ben Fink had any interest in the outcome of this case or would be affected in any way by the verdict. There was evidence by his own admission that Harry Brown felt great resentment toward Samuel Adelman for procuring his indictment in another case, and the fact of Adelman's connection with this crime in planning it and arranging with Clarke made the instruc-

268 — 38

tion material concerning the feeling of any witness being enlisted against the defendants. The court erred in refusing the instruction.

Instruction 11 was given, as follows:

"The court instructs you that the testimony of an accomplice is competent evidence, and the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness. The testimony of an accomplice must be received with great caution, but if the testimony carries conviction and the jury are convinced of its truth they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense."

The objection is that the word "should" was used instead of "may." The instruction only required the jury to give credit to the testimony of an accomplice if it carried conviction and the jury were convinced of its truth, and the jury could not fail to give it such credit without violating both the law and their duty. It is not the law that a jury may give credit or not, at the pleasure of the jury, to testimony which carries conviction and convinces the jury of its truth, and the instruction was not objectionable.

Instruction 3 given to the jury was as follows:

"The court instructs the jury, as a matter of law, that the rule which clothes every person accused of crime with the presumption of innocence and imposes upon the State the burden of establishing his guilt beyond a reasonable doubt is not intended to aid anyone who is, in fact, guilty of crime to escape, but is a humane provision of the law, intended, so far as human agencies can, to prevent an innocent person from being convicted."

The argument against the instruction is, that if the jury believe the accused to be guilty he is not entitled to the protection of a presumption of innocence, and that the presumption is merely for the benefit of the innocent and not the guilty. We do not understand the instruction, which

states the rule as clothing every person accused of crime with the presumption of innocence, as carrying any inference that the accused is not entitled to the benefit of the presumption in determining whether he is guilty or not.

In the argument to the jury the assistant State's attorney read from the opinion of this court in the cases of *People* v. *Covitz,* 262 Ill. 514, and *People* v. *Harris,* 263 id. 406. Counsel for the defendants objected to reading the facts in the *Covitz case,* in which the judgment against Joseph Clarke, one of the defendants in this case, was affirmed. The court ruled that the jury were entitled to have the facts in the case and overruled the objection. It was proper to read to the jury the law as declared in the case in question, and that rule was, that while the testimony of an accomplice is subject to suspicion and should be received with caution, yet it may be sufficient, although uncorroborated, to sustain a conviction, but the court considered and recited the evidence in the case to determine whether the evidence proved the truth of the charge against the defendants. In that case John Danies was an accomplice, and the opinion stated the evidence that Danies received a letter in New York from Joseph Clarke requesting him to come to Chicago; that he met Clarke, who arranged to have the Covitz brothers' place destroyed by fire; that Clarke carried on the negotiations with Danies and was the principal actor in the matter. There was no reason for reading this evidence to enable the jury to understand any rule of law, and the only purpose or effect of the recital of the evidence was to show the similarity of that case to this one and to lead the jury to a conclusion of fact as to the guilt of the defendant Rees. It was necessary to prove the arrangement with Clarke, who was to send the men to destroy the property and who was alleged to have fixed the price, including adjusting the loss. The assistant State's attorney had been telling the jury that Clarke was a well known firebug in Chicago, and the evidence read tended to prove his

assertion. The general rule is that counsel may read extracts from the opinions in reported cases bearing upon the law in the case but not the facts in the opinions. (12 Cyc. 583.) It may be necessary in some cases for counsel, under proper supervision of the court, to read enough of the ultimate facts in order that the jury may understand how the law is to be applied, (*Wohlford* v. *People,* 148 Ill. 296,) but there was no necessity of reading the evidence against Joseph Clarke for that purpose. In *Earll* v. *People,* 99 Ill. 123, it was said that it would have been entirely proper for counsel to have read any propositions of law laid down in the former case against the same party, but that the conduct of counsel in discussing the facts of the former case was highly unjust to the accused and placed him at a disadvantage before the jury. The plaintiff in error had a right to have his testimony go to the jury uninfluenced by the weight of the opinion of this court on the question of fact in the *Covitz case.* There was a stipulation that evidence against Joseph Clarke should be admitted although he was in the penitentiary and not on trial, but his conviction in the other case could not have been proved if he had been on trial unless he became a witness, and then only to affect his credibility as such witness, nor could the evidence against him in the *Covitz case* have been read to the jury. The ruling of the court was serious and prejudicial error.

There was a motion for a new trial based on newly discovered evidence. The court did not err in refusing to allow the motion, but as the case will be tried again, when the evidence alleged to have been newly discovered, if material, will be available, it is not necessary to say anything further respecting the denial of the motion.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*