THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ELLIS McINNIS, Defendant-Appellant.

First District (4th Division)    No. 79-27

Opinion filed August 21, 1980.—Rehearing denied October 9, 1980.

556

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Bruce Lester, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Ellis McInnis, was found guilty of murder and armed robbery and was sentenced to a term of 25 to 40 years in the Department of Corrections. A co-indictee, Deola Johnson, pleaded guilty to the same offenses and was sentenced to 14 years. On appeal, the defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the admission into evidence of hearsay acts and declarations of co-indictee Johnson violated his right to confrontation, cross-examination and due process of law; (3) his right to a fair trial was denied by the admission into evidence of statements not disclosed by the State; (4) the court erred by denying his motion for a new trial based on the discovery of a witness who was unavailable at trial; (5) he was denied due process because material evidence favorable to him was not disclosed by the prosecutor; (6) he was denied a fair trial by the court's denial of his motion *in limine*, which sought to preclude impeachment of his testimony with a prior criminal damage to property conviction;

(7) he was denied due process by the court's refusal to instruct the jury as to the manner in which certain considerations granted a State's witness by the State could affect his credibility; and (8) plain error occurred where the prosecutor argued to the jury assumptions and statements of facts not based on the evidence.

Jean Dornhoefer, wife of the victim, Marc Gromer, testified that in the summer of 1977 they were living in a third-floor apartment at 5344 South Woodlawn in the city of Chicago. Both were students at the University of Chicago. On July 5, 1977, about 11:15 p.m. they decided to go to Jimmy's, a bar, because it was hot in their apartment. They arrived at Jimmy's about midnight and stayed there for about 45 minutes, talking to two friends. The victim had one or two bourbons. The couple returned home and Dornhoefer went to bed while the victim remained in the living room.

Shortly after 4 a.m. on July 6, 1977, Dornhoefer was awakened by voices in the living room. She opened the bedroom door and took one step into the hallway. She was wearing a nightgown. Someone grabbed her from behind, put an arm around her stomach, and pushed her head down. A knife was held at her chest. The person who grabbed her "hissed" at her to "Lie down, get down." Based on the clothing and arms and legs of this person, Dornhoefer thought he was a male. She was forced to assume a deep knee bend position with her head in front of her knees. She struggled briefly and called out "Mark, Mark, what's happening." Mark did not answer, but Dornhoefer heard a voice from the living room say something about "money." The person holding her told her to "get down, get your white ass down."

Before Dornhoefer was grabbed by the person with the knife she had one glimpse into the living room and saw her husband standing near another person. The other person was shorter than five feet six inches or five feet seven inches. She saw nothing in the hands of that person and could not describe the clothing the other person was wearing. The person holding her was wearing a striped multicolored shirt, tan pants, socks and dark shoes with laces.

Dornhoefer heard two people struggling in the living room. The man holding Dornhoefer said "kill him" and a short time later she heard the sound of breaking glass. She heard the words "rug," "T.V.," and "kitchen," and heard the voice from the living room say "Let's go" or "Let's get out of here." Dornhoefer got to her feet and a few seconds later the person who had been in the living room ran past her. She was only able to see the back of this person. She heard the kitchen door open and close.

Dornhoefer walked over to the living room window, looked down, and saw her husband lying on the sidewalk. She changed her clothes and went downstairs. On the sidewalk next to her husband was one of their kitchen knives. A strip of cloth was wrapped around his neck. She accompanied her husband to Billings Hospital where, at 8:30 a.m., she was

informed that he was dead. She described the perpetrators as two male Negroes. The one in the living room was 13 to 15 years old and the one holding her was 18 to 21. She could not remember if she told the police that the person who held her talked with a hissing sound.

Later that day Dornhoefer returned to her apartment with two police officers and saw her living room was in disarray. Stereo speakers, a television, a suitcase with stereo equipment, a pair of curtains and a newspaper with some blood on it were on the floor.

Dornhoefer identified a photograph which portrayed her living room. The picture showed glasses and a pitcher which she and her husband used for dinner on July 5. She did not notice whether anything was missing from the apartment. She identified her husband's wedding ring in the police station on July 7, 1977. The victim always wore his ring except when he did the dishes.

On July 5, 1977, Dornhoefer parked the couple's 1974 Mustang on 54th between Woodlawn and Kimbark. The next time she saw the car it was parked at 54th and University.

Boyce Murphy, a caseworker at the Juvenile Detention Center, testified that he had known Deola Johnson for approximately five years and the defendant for approximately 1½ years. He said that at about 1:30 a.m. on July 6, 1977, he saw the victim wandering around the Tiki Lounge talking to several people. He did not see the victim drink anything but he looked a little high. When Murphy left the bar at about 2 a.m. he saw the victim talking to the defendant and Deola Johnson in a car. Murphy said Johnson was dressed boyishly and had a boyish natural hairdo.

Levar Lewis testified that he pleaded guilty to a charge of attempt burglary on March 25, 1977. He received 60 days work release and three years probation. He was convicted of delivery of marijuana on August 29, 1975.

On July 5, 1977, at 11:15 p.m., Lewis arrived at Harper's Court at 53rd and Harper where he saw the defendant. The defendant's jaw had been broken and was wired. He talked through his teeth. The next day Lewis saw the defendant at the defendant's apartment. At that time the defendant told Lewis that he and Johnson had met a guy at the Tiki and were invited to his apartment. The defendant and Johnson agreed to "rip him off." The man "got wise" to what was happening so the defendant told him to lie down and then tied him up at knife point. They cut his ear. The defendant was gathering the stereo equipment when the man's wife came out of the bedroom. The defendant grabbed the wife, threw her down and told her to be quiet. The man was getting loose, the defendant told Johnson to kill him, and the man "pushed out the window with both hands out the window backwards." The defendant said no one pushed the man. After the man fell, the defendant wiped his fingerprints off the door and kitchen counter, ran out the back door and jumped over a fence. The defendant told Lewis

the victim was white and lived at 54th and Woodlawn. The woman was wearing a nightgown.

Lewis saw the defendant again the next day, July 7, at the Unique Restaurant. He showed the defendant a newspaper article concerning the death of the victim. The defendant said he was worried that the man had talked before he died. He asked Lewis to look for Deola Johnson because he did not know if she had been arrested. Later that day Lewis learned that a reward had been offered. He went to the police and told them about his conversations with the defendant. He asked about the reward but he did not ask for any money. He went to the police before he read the newspaper. He admitted there was a lot about the incident in the newspaper. He saw the defendant again on July 8 at the Unique Restaurant. He said he did not remember what was said that day but admitted he could have told the defendant "Ellis, the police are looking for you," and that the defendant could have replied "I'll be right here working."

Lewis said he saw Phillip Grew about a week after he spoke to the police. Lewis denied telling Grew that the defendant had told him, Lewis, that the defendant had gone to the apartment and smoked marijuana and left and that nothing had happened to the man.

Lewis admitted that he was testifying for the reward. The State's Attorney was paying his rent while he was staying in the witness' quarters. He asked the police to relocate him from Hyde Park. In July he reported to the police that he had been shot at. He was never told that if he did not testify he would get three to five years. This is what he told his friends and sister, but he made it up. At the time of trial he had a violation-of-probation case pending. The State told him it would talk to the judge on the violation-of-probation case and would see if the probation could be extended. He had a battery case pending for which he had been charged after he got out of the witness quarters.

Lewis said he wrote a letter to the defendant. In the letter he said he had been arrested and that he would get three to five years if he did not testify. He admitted this letter was false. The reason he wrote the letter was in case the defendant knew who had shot at him.

Joseph Booth testified that at approximately 4:30 a.m. on July 6, 1977, he was awakened by Deola Johnson. She entered his apartment mumbling "[h]e went out the window." Johnson told Booth that she and her friend were on Woodlawn to "rip off" an apartment and that someone went out of the window backwards when they were in the process of tying him up. Johnson took a ring off her finger, put it on a table, and told Booth she did not want to get caught with it. Booth turned the ring over to the police. Booth knew Johnson was a heroin addict and a prostitute.

John Janda, a Chicago police officer, testified that he received a ring from Booth and that Dornhoefer identified it as her husband's ring.

Paul Marshall, a paramedic with the Chicago Fire Department, testi-

fied that on July 6, 1977, he responded to a call at 5344 South Woodlawn. He saw the victim lying on the sidewalk. He was bleeding, unconscious, and had a tan colored cloth about four inches wide in his mouth. Marshall observed blood on the left side of the victim's face. He saw no other blood. Marshall removed the cloth from the victim's mouth. He saw no knife. While they were working on the victim a policeman came up to them with a knife and asked them to look for a stab wound. They did not find a stab wound.

Dr. Jeffrey Korn, a physician, testified that at about 5 a.m. on July 6, 1977, he received the victim as a patient from an ambulance at the emergency room of Billings Hospital. The vicim had blood coming out of his ears, nostrils and mouth, was breathing weakly and was unconscious. At 6:30 a.m. he was pronounced dead. His injuries were no different from the injuries of anyone who might have fallen from a high place.

Dr. Robert Stein, chief medical examiner of the Cook County coroner's office, testified that he performed an autopsy on the remains of the victim on July 7, 1977. He observed numerous incised wounds, abrasions and contusions on the victim's head, face, chest, abdomen, inguinal region and lower extremities. It was his opinion that the cause of death was a severe cranial cerebral injury. He found no incised wound on the ear. He found no stab wounds. The injuries Stein observed were consistent with the victim having gone through a plate glass window and fallen on a hard substance 30 feet below. A toxicological report showed the presence of 129 milligrams percent alcohol in the blood and 116 milligrams percent alcohol in the bile. Tests for barbiturates, tranquilizers and opiates were negative; no tests were performed to determine the presence of marijuana.

Richard Thompson, a mobile lab technician with the criminalistics division of the Chicago Police Department, testified that on July 6, 1977, he was sent to 5344 South Woodlawn. He observed blood and broken glass on the sidewalk outside the apartment. He conducted a search for physical evidence in the apartment. He photographed the living room and found a piece of broken glass and a piece of newspaper with a red stain on it. Thompson took four sets of fingerprints from the living room, including prints from a stereo receiver.

Ronald Salter, an evidence technician with the Chicago Police Department, testified that he processed a 1974 Mustang for fingerprints. He obtained prints from the front window, rear view mirror and right rear seat latch.

Theatrice Patterson, a fingerprint technician with the Chicago Police Department, testified that the print obtained from the bottom of the stereo receiver was Deola Johnson's and that the defendant's print was on the right rear seat latch of the car.

Louis Vitullo, an employee of the police department's crime laboratory, testified that he examined the newspaper found in the victim's apart-

ment. Two black and white animal hairs and one reddish-brown human Caucasian hair were found on the paper. The human hair was embedded in the blood. The blood was type AMN, which was the victim's blood type but not the type of the defendant or Johnson. The cloth found around the victim's neck also contained blood of the same type as the victim. A microscopic examination of the cloth did not indicate that it had been tied or bound.

Chicago police officer David Williams testified that he and his partner arrested the defendant on July 8, 1977, at the Unique Restaurant. The defendant spoke with clenched teeth; there was a hissing sound to his speech. Before testifying, Williams had read reports in which he had seen the phrase "hissing sound."

Wayne White, an investigator for the Chicago Police Department, testified for the defense. He said that a resident of the victim's building told him he saw someone coming down the stairs carrying an unidentified object at approximately 4 a.m. the night of the crime. The man told White he thought the person he saw was a male but it was dark and he was judging by the person's build rather than by any noticeable signs.

The defendant testified that on the evening of July 5, 1977, he was with the victim, Deola Johnson and another man outside the Tiki Lounge about 11 p.m. The defendant asked the victim for some of the reefer he was smoking. The victim said it was at his home and invited the defendant and Johnson to accompany him there. The defendant got in the back seat of the victim's car and Johnson got in the front. The victim drove to his building and parked at 54th and Woodlawn.

They started to smoke some reefer in the living room. Johnson asked for something to eat and the victim brought out a cantaloupe and three plates. The victim kept telling Johnson he wanted to go to bed with her so the defendant told them he was going to leave and he did so. He got home about 2:30 or 3 a.m.

Early the next morning Lewis came to his apartment and asked him if he had heard anything about the killing at 53d and Woodlawn. The defendant told Lewis he had been over that way the night before with Johnson but denied having anything to do with the killing. Lewis told him he ought to leave and he responded that he was not going anywhere except to work. The next day, about 1 p.m., Lewis came to the restaurant where the defendant worked and started telling him about the incident. He told Lewis he did not have anything to do with it and that he did not want to hear about it. He was arrested the next day. The defendant denied telling the police that he was at Michael Reese Hospital with a broken jaw the evening of July 5 and the morning of July 6. He told them he was at home during the time they were asking about. He did not tell them he had seen Johnson with the victim or that he had been to the victim's apartment. He said he told the

police he had last seen Johnson on July 5. He admitted a 1971 conviction for criminal damage to property and a 1972 conviction for unlawful use of a weapon.

Phillip Grew, a University of Chicago student, testified that on July 16, 1977, Lewis told him that the defendant told Lewis he had been at the victim's apartment; that when he left the victim was all right; and that nothing had happened at the apartment. Grew saw Lewis a week later and asked if what he had said on the bus was true. Lewis responded that they would have to discuss it and not mention it to anyone.

In rebuttal, police officer Williams testified that when he arrested the defendant he asked him where he was during the early morning hours of July 6, 1977. The defendant said he was at Michael Reese Hospital with a broken jaw and denied having been with Johnson. The report Williams later made out stated that he arrested the defendant, advised him of his rights, and took him to the station. He acknowledged that the report form directed him to give a detailed report of everything said by the witness. Williams explained that he did not put the defendant's statement in his report because it was an alibi and alibis are normally checked by the homicide investigators.

Joseph Murphy, a homicide investigator, testified that on July 8, 1977, he and his partner met with the defendant. The defendant told them that on the evening of July 5 and the morning of July 6, 1977, he was at home in bed with a broken jaw. The defendant also told them that the last time he had seen Johnson was a couple of weeks earlier and that he was not with her the evening of July 5. Murphy did not put those questions and answers in his report but rather only a summary. The report states that the defendant was advised of his rights and that he denied any knowledge of the crime and admitted knowing Johnson from East 53rd Street. The defendant did not tell them he was in the hospital on July 5 and 6.

The jury returned verdicts finding the defendant guilty of armed robbery and murder. The defendant filed post-trial motions alleging in part that (1) there was newly discovered evidence in that Johnson was now willing to testify on his behalf; and (2) the State had suppressed relevant information. The motion was denied.

On appeal, the defendant first argues the State failed to prove he was guilty of murder and armed robbery beyond a reasonable doubt. In support of this argument the defendant contends Dornhoefer was unable to identify him; there was no physical evidence connecting him to the robbery or the murder; Lewis' testimony was suspect; and that all other evidence of guilt is circumstantial. The defense submits there is no evidence which negates the possibility that someone other than the defendant visited the victim at his apartment following the defendant's departure. It also argues anyone attempting to disguise his voice might speak in a "hissing" manner

and it points out that Dornhoefer described her assailants as two adolescent males, one very short. The defendant was in his mid-twenties in July of 1977. In connection with the robbery conviction, the defense points out that Dornhoefer admitted she had no knowledge whether any property had been taken from the apartment.

The jury was properly instructed as to the elements of the offenses of murder and armed robbery and the principles of legal accountability. The accountability instruction (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (1968) (hereinafter cited as IPI Criminal)) informed the jury that "[a] person is responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of the crime." The jury was further instructed that

> "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, * * * he *or a person for whose conduct he is responsible* is attempting to commit or is committing the crime of armed robbery." (Emphasis added.) (IPI Criminal No. 7.01.)

The jury was also instructed that a person commits the crime of armed robbery who, while armed with a dangerous weapon, takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

■■ Credibility of the witnesses was a critical factor here in light of the numerous conflicts between the testimony of the State's witnesses and that of the defendant. Determinations of the credibility of witnesses is a matter left to the trier of fact, in this case the jury. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) We believe there was sufficient evidence which, if believed, warranted the jury's conclusion that the defendant was guilty beyond a reasonable doubt of armed robbery and murder.

The defendant admitted being in the victim's apartment on the night of the crime but said he left before any robbery or murder occurred. Dornhoefer's testimony that the man holding her spoke with a "hissing" sound, together with Lewis' testimony that the defendant told him that he, the defendant, was present when the victim went out the window, were sufficient, if believed, to place the defendant at the scene of the crime when the death occurred.

The jury could also have found that the defendant was responsible for the conduct of Johnson in light of Lewis' testimony that the defendant said he and Johnson went to the victim's apartment intending to "rip him off" and Dornhoefer's testimony that the man who the jury could find was the defendant, restrained her while Johnson struggled with the victim. If believed, the testimony from Booth that Johnson left the victim's wedding

ring with him saying she did not want to get caught with it, together with the evidence of a struggle, was sufficient evidence of robbery. Dornhoefer's testimony that the man who restrained her held a knife at her chest was sufficient evidence of the dangerous weapon element of armed robbery. Finally, there was sufficient evidence to find the defendant guilty of murder if the jury believed that the defendant was legally accountable for Johnson's actions, that Johnson's struggle with the victim caused his death, and that the death occurred during the course of the armed robbery.

The defendant's next argument is that the admission into evidence of Booth's testimony concerning the hearsay acts and declarations of his co-indictee Johnson violated his rights to confrontation, cross-examination and due process of law. The defendant contends these acts and declarations were not made during the pendency of or in furtherance of any conspiracy. He argues that when Johnson made the statements to Booth and left the ring in his apartment, the conspiracy was already completed and the criminal objective had ended. He further contends that Johnson's statements constituted a mere narration of past events which renders them inadmissible (see *Samples v. People* (1887), 121 Ill. 547, 13 N.E. 536), and had no tendency to further the criminal objective of the robbery.

In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the United States Supreme Court held an accused's sixth amendment right to confrontation is violated where the statements of a co-defendant which inculpate the accused are admitted into evidence without the accused being afforded an opportunity to cross-examine the co-defendant. However, in *People v. Davis* (1970), 46 Ill. 2d 554, 264 N.E.2d 140, the Illinois Supreme Court held that the *Bruton* rule does not apply to statements of co-defendants which are made in furtherance of a conspiracy.

The authorities differ on the question of when a conspiracy ends. The Federal courts have taken the position that a conspiracy terminates with the commission of the underlying offense. (*Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210.) However, a number of other State courts have held that a conspiracy includes acts and declarations directed at concealing the crime. (See, *e.g., Reed v. People* (1965), 156 Colo. 450, 402 P.2d 68; *State v. Roberts* (1915), 95 Kan. 280, 147 P.828.) In *Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210, the United States Supreme Court upheld the constitutionality of a Georgia statute which permitted the admission of co-conspirators' declarations made during the concealment phase of a conspiracy. (See *People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215, for a discussion of *Dutton*.) In *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801, this court considered the question of when a conspiracy terminates and concluded "the better view to be that a conspiracy includes subsequent efforts at concealment, but·

only if those efforts are proximate in time to the commission of the principal crime." 70 Ill. App. 3d 597, 603, 388 N.E.2d 801, 805.

Here, the dispute relates to the testimony of Booth, a friend of Johnson's. Booth testified that at approximately 4:30 a.m., on the morning of the victim's death, Johnson entered his apartment mumbling "[h]e went out the window, [h]e went out the window." Johnson told Booth that she and her friend were on Woodlawn to "rip off" an apartment and that someone went out of the window backwards when they were in the process of tying him up. Johnson took a ring off her finger, put it on a table and told Booth that she did not want to get caught with it. The ring was later identified as belonging to the victim.

■■ These acts and declarations of Johnson were made about half an hour after the crime occurred and thus were proximate in time to the commission of the robbery and murder. Under the *Meagher* holding, we believe Booth's testimony concerning Johnson's acts and declarations was properly admissible as it concerned efforts at concealment. Johnson's act in leaving the ring with Booth was clearly an attempt to conceal the facts of the robbery and her presence at the scene of the crime. Although her statement "he went out the window" fits the concealment category less clearly, we believe it could reasonably be construed as an attempt to convince Booth of the seriousness of the crime and, therefore, the necessity for his silence. See *Meagher*.

We also believe that any error in admitting Booth's testimony under the co-conspirator exception would be harmless error. Police Officer Janda was properly allowed to testify that he received a ring from Booth and that it was subsequently identified by Dornhoefer as belonging to her husband. The hearsay rule would not have excluded Booth's testimony that Johnson gave him the ring. In light of the other evidence, including the defendant's own testimony, which placed him at the victim's apartment on the night in question, we do not believe that the admission into evidence of Johnson's statements to Booth, which made no mention of the defendant, constituted reversible error if it was error at all.

The defendant next argues he was denied a fair trial by the admission of statements attributed to him by the police officer witnesses because those statements were not disclosed to the defense under discovery rules. The State's answer to discovery stated that the defendant had made oral statements and referred to the police reports for "time, place and circumstances." The police report of Officers Williams and Tullos said that when the defendant was asked if he would relate his knowledge of the death of the victim he said "in summary * * * that he has known Deola Johnson for some time from the area of east 53rd Street but he denied any knowledge of the crime in question."

On cross-examination the defendant denied telling Williams that on

the evening of July 5 and the morning of July 6 he was in the hospital with a broken jaw. He also denied telling Donnelly and Murphy that he was at home on those dates with a broken jaw. Murphy and Williams were called as rebuttal witnesses. Williams said the defendant told him he was in the hospital the night of the murder. The defense did not object to these questions. Murphy said the defendant told him that on the night of the murder he was at home in bed with a broken jaw, and that he had not seen Johnson for a couple of weeks. An objection to these questions was overruled.

Supreme Court Rule 412(a)(ii) (Ill. Rev. Stat. 1979, ch. 110A, par. 412(a)(ii)) requires the State to disclose to defense counsel the following material and information within its possession or control: "any written or recorded statements and the *substance of any oral statements made by the accused* or by a co-defendant, and a list of witnesses to the making and acknowledgement of such statements" (emphasis added). The defendant argues the failure to disclose his statements constitutes reversible error because it directly contradicted his alibi testimony at trial. The State responds that Rule 412 was "substantially" complied with because the statements were noninculpatory and were used only to rebut the defendant's testimony at trial. It also contends the defendant has waived this issue by not objecting to Williams' testimony at trial. Finally, the State notes that the police report explicitly stated that the defendant's statements were being "summarized" in the report.

■■ The purpose of Rule 412(a)(ii) is to protect a defendant against surprise, unfairness and inadequate preparation and to afford the defense an opportunity to investigate the circumstances surrounding a statement. (*People v. Young* (1978), 59 Ill. App. 3d 254, 375 N.E.2d 442.) We cannot agree that the State "substantially complied" with Rule 412 by turning over the police report, which stated that the defendant said that "in summary * * * he has known Deola Johnson for some time from the area of east 53rd Street but he denied any knowledge of the crime in question." This "summary" does not give any indication that the defendant provided details, to two officers, concerning his supposed whereabouts during the time of the crime. The prosecution should have realized that the defendant might choose to testify in his own behalf and that, if he chose to do so, his defense might consist of an alibi, particularly in light of their knowledge of the statements he had made to the police concerning his whereabouts at the relevant time. An inconsistent alibi would obviously have an impeaching effect on the defendant's credibility. We thus cannot say that the State met its statutory obligation to disclose "the substance of any oral statements" made by the accused.

■■ However, we do not believe this error necessitates reversal. The prejudicial impact of this discovery violation was minimal. First, the

defendant waived any objection to Williams' testimony by not objecting at trial. (*People v. Haywood* (1978), 60 Ill. App. 3d 236, 376 N.E.2d 328.) Thus, the prejudicial effect of Murphy's testimony, which followed Williams' was minimized. Additionally, the statements which were not disclosed to the defense were noninculpatory (see *People v. Sullivan* (1977), 48 Ill. App. 3d 555, 362 N.E.2d 1313), unlike the cases relied on by the defense where reversible error was found. (See, *e.g., People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117; *People v. Shegog* (1976), 37 Ill. App. 3d 615, 346 N.E.2d 208.) Finally, we note that the defendant himself testified that he told the police he was "at home" during the time they were inquiring about. However, he also testified that he was at the victim's apartment that night and that he did not get home until 2:30 or 3 a.m. On the basis of this testimony alone the jury could have concluded that the defendant was presenting inconsistent alibis. We cannot say that the admission of Williams' testimony concerning which the defendant has waived the right to appeal, followed by the admission of Murphy's testimony, which was error, constituted sufficient prejudice to warrant reversal for a new trial.

The defendant's next argument is that the trial court erred in denying his post-trial motion which sought a new trial on the basis that Johnson, who was unavailable to testify at trial due to her intent to assert her fifth amendment privilege, was at the time of the motion, willing to testify for the defendant and that her testimony would corroborate his. Defense counsel submitted an affidavit stating that prior to trial he had spoken with Johnson and at that time she stated she would not testify on behalf of the defendant. Following the guilty verdict Johnson contacted him and said she would testify for the defendant and that her testimony would corroborate his. She said her previous refusal to testify was based on the mistaken belief that the defendant's counsel was responsible for her having to plead guilty.

■■ This court recently had occasion to discuss the standard for granting a new trial on the basis of newly discovered evidence:

> "In order to entitle defendant to a new trial, newly discovered evidence must meet the following standards: it must be conclusive and likely to change the result upon retrial; it must be material and noncumulative; it must have been discovered after the trial; and it must be of such a character that it could not have been discovered before trial by the exercise of due diligence. [Citation.] Applications for a new trial on the basis of newly discovered evidence are largely discretionary with the trial court, and its exercise of discretion will be disturbed only when manifestly abused. [Citation.] Such applications are not looked on with favor, and they should be subjected to the closest scrutiny by the court. [Citation.]" (*People v. Ramos*

(1980), 80 Ill. App. 3d 722, 725, 400 N.E.2d 676, 679.)

Similar facts were considered by this court in *People v. Whittaker* (1978), 56 Ill. App. 3d 430, 373 N.E.2d 30. There, the defendant had been convicted of attempt theft. He filed a post-trial motion seeking a new trial on the basis, in part, of newly discovered evidence. The motion alleged that a co-defendant, after previously refusing to testify on the defendant's behalf, had come forward and revealed that he was the "sole moving factor" in the offense. It further alleged that the defendant did not and could not know that a criminal offense was being committed. The motion was denied and, on appeal, the conviction affirmed. The court wrote:

> "[W]e are unable to agree with the defendant that the evidence of [the co-defendant] was unknown to him and could not have been discovered in the exercise of reasonable diligence. The most that can be said about the affidavit and testimony at the hearing is that prior to trial or at least during the trial [the co-defendant] declined to testify favorably for the defendant. [The co-defendant] was known to the defendant and was accessible to testify. That the witness may have changed his mind after the trial was over does not refute the conclusion that the evidence was known to or could and should have been known by the defendant." (56 Ill. App. 3d 430, 433-34, 373 N.E.2d 30, 32.)

We believe *Whittaker* is indistinguishable and that a similar result is mandated here. The defendant was aware of Johnson's existence and location prior to trial. He is not now entitled to a new trial merely because she changed her mind concerning her willingness to testify on his behalf.

The next argument made by the defendant is that he was denied due process where material evidence favorable to the defense was not disclosed by the prosecutor. Prior to trial the State filed a supplemental answer to discovery in which it stated that the South East Chicago Commission (the Commission) had provided a reward. A copy of the reward notice was attached:

> "The South East Chicago Commission will provide a $5000. reward to be administered by the Chicago Police Department for information leading to the arrest and conviction of the persons who committed the home invasion and homicide at 5344 Woodlawn Avenue on Wednesday, July 6, 1977.
>
> Persons with information that could lead to the arrest and conviction of the perpetrators of this crime should call the Special 24-hour Chicago Police Department number—744-8381. People need not identify themselves, or they may request that their names be kept confidential."

In a post-trial motion defense counsel stated that Booth and Murphy

testified with the belief and understanding that they would share in part of the reward which had been offered, and that the State's Attorney's office was aware of this fact but had not communicated it to defense counsel.

At a hearing on the motion defense counsel said he was misled by the police reports in that they indicated Murphy had volunteered his information purely as a disinterested citizen. He also said the State had knowledge of the fact that Murphy and Booth expected to share in the reward because the individual representing the Commission was on the State's list of witnesses, sat through the entire trial, and was in constant communication with the State's Attorney's office. The court denied the motion. The prosecutor then asked to be heard concerning the reward and stated there had been no distribution of the reward and that no party had received any money or any promises. He also said it was not until after trial that the Commission asked for applications for the reward money.

In arguing that the defendant should be given a new trial the defense quotes from the State's closing argument in which it was argued that Murphy and Williams had "no motive to lie." The defendant contends that had the jury known that Murphy and Booth expected to share in the reward its assessments of those witnesses' credibility might have been altered and that their testimony was critical because it corroborated that of Lewis.

The State is under a duty to "disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." (Ill. Rev. Stat. 1979, ch. 110A, par. 412(c).) The State also must "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." (Ill. Rev. Stat. 1979, ch. 110A, par. 412(f).) However, where the prosecutor is not in possession of such evidence, it may hardly be accused of suppression. *People v. Gaitor* (1977), 49 Ill. App. 3d 449, 364 N.E.2d 484.

■■■ On a motion for a new trial the defendant bears the burden of rebutting the presumption of correctness which attaches to a verdict and the mere allegations of the motion are not evidence of the grounds raised therein. (*People v. Boyce* (1977), 51 Ill. App. 3d 549, 366 N.E.2d 914.) We cannot determine from the record before us whether or not the prosecution was aware of the fact that, as the defense alleges, Murphy and Booth expected to share in the reward. The defense contended in its motion and in argument that the State did in fact have this knowledge. In making this contention it relied upon the fact that the Commission's representative was present during the trial and was in communication with the State's Attorney's office. Assuming that Murphy and Booth in fact had communi-

cated with the Commission concerning the reward, we cannot see how the State is presumed to have known this fact merely because a representative of the group offering the reward was present during the trial. During argument on the defendant's post-trial motion, the Assistant State's Attorney said there had been no distribution of the reward, that no party had received any money or any promises and also that it was not until after the trial that the Commission had asked for applications for the money. In light of the unclear picture presented by the record and the lack of affidavits from persons having knowledge of the alleged facts (*Boyce*), we cannot say that the defendant has sustained his burden of rebutting the presumption of correctness which attaches to the verdict.

The defendant next argues he was denied his right to a fair trial by the trial judge's denial of his motion *in limine* to preclude impeachment of his testimony with his 1971 criminal damage to property conviction. During argument on the motion the Assistant State's Attorney enumerated the defendant's prior convictions; 1971, burglary reduced to criminal damage to property; 1972, felony unlawful use of weapons; 1976, unlawful use of weapons; and 1977, criminal damage to property. The court and counsel had a discussion about the admissibility of prior convictions and the defense counsel said that none of the convictions were impeaching. The Assistant State's Attorney responded that the felony convictions were clearly admissible and that the criminal damage to property and misdemeanor unlawful use of weapons were discretionary. The court then referred to the 1971 offense as "burglary" and said the first two would be admissible for impeachment and that the second two would not be. The trial judge's characterization of the 1971 conviction as "burglary" was not objected to or corrected by counsel. The defendant then testified to both convictions on direct examination.

■■ The parties agree that it was error to admit the 1971 conviction for criminal damage to property for impeachment purposes. The State argues, however, that the issue was waived and that in any case it was a harmless error. We agree.

It is apparent from the record that the trial judge believed the 1971 conviction was for burglary rather than criminal damage to property. He referred to the 1971 conviction as a "burglary" and was not corrected. The trial judge's misapprehension was also made apparent by the fact that he ruled inadmissible the defendant's 1977 conviction which was also for criminal damage to property. Defense counsel should have called this to the court's attention and by not doing so has waived the issue for purposes of appeal. *People v. Haywood* (1978), 60 Ill. App. 3d 236, 376 N.E.3d 328.

The defendant next argues he was denied due process by the failure to instruct the jury with a non-IPI instruction concerning the manner in which

the consideration Lewis was to receive or had received for his testimony would affect his credibility.

The jury was instructed concerning the credibility of witnesses with IPI Criminal No. 1.02, which provides:

> "You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, *any interest, bias or prejudice* he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case.
>
> You should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness." (Emphasis added.)

The defense tendered two additional instructions which it argues were necessary for the jury to properly evaluate the testimony of Lewis:

> "The testimony of a witness who provides evidence against a defendant for pay, or for immunity from punishment, of for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the witness' testimony has been affected by interest, or by prejudice against defendant.
>
> One who testifies under a grant of immunity or a promise of help from the prosecution in his own criminal case is a competent witness. His testimony may be received in evidence and considered by the jury even though not corrobrated or supported by other evidence.
>
> Such testimony, however, should be examined by you with greater care than the testimony of an ordinary witness. You should consider whether the testimony may be colored in such a way as to further the witness' own interest, for a witness who realizes that he may procure his own freedom by incriminating another has a motive to falsify. After such consideration, you may give the testimony of the immunized witness such weight as you feel it deserves."

The trial judge refused these non-IPI instructions on the ground that IPI Criminal No. 1.02 adequately instructed the jury as to the credibility of all the witnesses.

The defense argues Lewis admitted to several facts which may have provided him with a motive to falsely accuse the defendant or which demonstrated his interest in the case. They point out that Lewis had a violation of probation petition pending and was promised by the State that

it would talk to the judge in that case in an effort to get his probation extended if he cooperated; that Lewis was housed in witness quarters while the case was pending; that he had sought and received help from the State in relocating from his former neighborhood; that the State was paying his rent in his new building; and that he hoped to collect a $5,000 reward.

The defense also contends the need for a non-IPI instruction was made even more apparent by the State's closing argument in which the Assistant State's Attorney, in commenting on Lewis' hopes of getting a reward, said:

"I can appreciate you may not like that about friends, but that's what a reward is for, it is a motive to come forward. *It is not a motive to lie*, and what he told the police that day that he went is uncontradicted." (Emphasis added.)

In making this argument the defense relies on *People v. Rees* (1915), 268 Ill. 585, 109 N.E. 473, *People v. Mostafa* (1971), 5 Ill. App. 3d 158, 274 N.E.2d 846, and *People v. Collins* (1971), 49 Ill. 2d 179, 274 N.E.2d 77. *Rees* was decided well before the IPI instructions were drafted and the court there was not subject to the Supreme Court Rule which states that only when there is no applicable pattern instruction or when such instruction inaccurately states the law may a defendant tender a non-IPI instruction. (Ill. Rev. Stat. 1979, ch. 110A, par. 451(a).) *Collins* is inapposite as it involved an alibi defense and an improper closing argument which shifted the burden of proof to the defendant to prove his alibi. The *Collins* court did not address the subject of instructions concerning credibility of witnesses. *Mostafa* lends more support to the defendant's contention. That case involved the uncorroborated testimony of accomplices. Two of the witnesses had been promised their sentences would be reduced if they testified and a third witness had murder charges dismissed and was given monetary subsidies by the State's Attorney. The court there found that the defendant's proposed instruction, which stated in part that the jury had "[a] right to take into considertion whether [the accomplice witnesses] have been promised consideration in relation to their punishment for their testimony" (5 Ill. App. 3d 158, 166, 274 N.E.2d 846, 852) was improperly refused.

We prefer to adopt the rationale of the court in *People v. Parks* (1975), 34 Ill. App. 3d 180, 340 N.E.2d 121, *rev'd on other grounds* (1976), 65 Ill. 2d 132, 357 N.E.2d 487. That case also involved accomplice testimony. Parks' co-defendant agreed to testify for the State and was transferred to witness quarters under an individual bond which was conditioned upon his testimony at Parks' trial. The accomplice testified that he would be pleading guilty to armed robbery and not to the pending murder charge and that the Assistant State's Attorney had told him that he would recommend a sentence of five years. The jury was given the general

instruction on credibility, IPI Criminal No. 1.02, as was done in the instant cause. An instruction proposed by the defendant told the jury they should consider " 'whether any witness has become interested or hopes to receive any reward, immunity or benefit from the prosecution of the case, or has in any other way become interested * * * ' " (34 Ill. App. 3d 180, 184, 340 N.E.2d 121, 124) was refused. The appellate court found this non-IPI instruction was properly refused because IPI Criminal No. 1.02 adequately stated the law.

■■ We believe a similar result is mandated here. IPI Criminal No. 1.02 instructed the jury to consider "any interest, bias or prejudice he may have * * * ." This statement adequately instructed the jury into consideration, in evaluating Lewis' testimony, the State's promise concerning his pending violation of probation petition, the fact that he was housed in witness quarters, the State's assistance in relocating him, and his hopes of collecting the reward. The refused defense instruction on credibility was unnecessary.

The defendant's final argument on appeal is that he was denied his right to a fair trial and to confrontation and cross-examination where the prosecutor argued to the jury assumptions and statements of facts which were not based on the evidence.

The first alleged error raised in this regard involves Lewis' testimony that the defendant told him that they had cut the victim's ear. In closing, the State said,

> "Well, if you recall the testimony of Dr. Stein, he said there were multiple cuts, contusions, abrasions and lacerations about the head, face and neck area of the man, all consistent with going out that window and being cut by glass."

The prosecutor then said "Don't be misled when counsel tells you there is no cut on the ear." The defendant argues this was a prejudicial misstatement of fact because the evidence in fact showed no cut on the victim's ear, and this contradicted Lewis' testimony.

■■ During closing argument counsel is entitled to comment on the facts in evidence and to argue reasonable inferences which can be drawn from that evidence. (*People v. Halteman* (1956), 10 Ill. 2d 74, 139 N.E.2d 286; *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) In light of Stein's unequivocal testimony that he found no incised wound on the victim's ears, we believe the prosecutor's comment that the jury should not be misled by defense counsel saying there was no cut on the ear went beyond a reasonable inference which could be drawn from the evidence. However, we cannot say that this misstatement amounts to reversible error in light of all the other testimony which gave the jury an opportunity to evaluate Lewis' credibility.

■■ The defendant also argues the prosecutor misstated the facts in

evidence in his attempt to negate the inference that Lewis might have made up the defendant's "confession" from details reported in the newspaper. Some of the comments objected to on appeal were not objected to at trial. Those portions of closing argument will not be quoted or discussed here because the defendant has waived the issue. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) The defendant's objection to another portion was sustained below and will not be discussed here. The comment concerning which the defense properly objected below and thus preserved the issue for appeal is the following:

> "Deloa [*sic*] Johnson's name, ladies and gentlemen, only came to the Chicago police after Joe Booth talked to them, after Joe Booth told them that Deola Johnson gave me this ring, and that was late on July 7th. It wouldn't have been in the newspaper that Levar Lewis brought over at twelve o'clock noon."

In connection with this statement, the defense argues Booth testified that he went to the police in the morning, rather than "late on the 7th" and that there was no evidence which negated the possibility that prior to speaking with Booth the police might have received information from another source implicating Johnson. We cannot accept this argument. The contention that a different, reasonable inference might be drawn from the same evidence does not make the inference which the State chose to argue improper or impossible.

■■ Finally, the defendant objects to portions of the State's closing which, he contends, involved unfounded statements made to convince the jury that the victim's death had occurred during the course of a robbery. The only statement made in this regard to which the defendant objected below and thus preserved for review is the following:

> "What happened then inside the apartment? Jean Dornhoefer hears another voice, 'Get the money!'"

The defendant points out that Dornhoefer testified she heard only the word "money." We agree that this was an improper misstatement of the evidence but cannot say it amounts to prejudicial error. Although the phrase "Get the money" connotes more strongly the possibility of a robbery than does the single word "money," there was other evidence from which the jury could conclude that a robbery had occurred, particularly the fact that Johnson left the victim's wedding ring with Booth, saying she did not want to get caught with it. We cannot say the error was other than harmless. For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.